# Illinois Official Reports

## Appellate Court

---

### *In re Estate of Mivelaz*, 2021 IL App (1st) 200494

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF AUDREY MIVELAZ, a Disabled Person (Sally J. Berveiler, George J. Cerveny, David A. Corona, Mark T. Kudelka, Eric Hilbert, Thomas M. Lotina, Janet L. Mohr, Nancy G. Storey, Shirley Trevena, and Carol S. Walker, Petitioners-Appellants, v. Fifth Third Bank, as Discharged Plenary Guardian of the Estate of Audrey Mivelaz, a Disabled Person (Now Deceased), as Trustee of the Audrey Mivelaz Revocable Trust, and as Independent Executor of the Estate of Audrey Mivelaz, Deceased; Phyllis Jaffe and Raphael Juss, as Former Co-Guardians of the Person of Audrey Mivelaz and as Trust Beneficiaries; and Rosemary Denison and Rose Gordon, as Trust Beneficiaries, Respondents-Appellees). |
| District & No. | First District, Second Division<br>No. 1-20-0494 |
| Filed | August 10, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-P-3672; the Hon. Jesse Outlaw, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Paul S. Franciskowicz and Kathryn T. McCarty, of FMS Law Group LLC, and Tarick Loutfi, of Loutfi & Associates, both of Chicago, for appellants. |

Kerry R. Peck, Timothy J. Ritchey, and Patrick J. Bushell, of Peck Ritchey, LLC, of Chicago, for appellee Fifth Third Bank.

Mitchell S. Feinberg and Loretto M. Kennedy, of Chuhak & Tecson, PC, of Chicago, for appellees Phyllis Jaffe, Raphael Juss, and Rose Gordon.

No brief filed for other appellee.


Panel                    JUSTICE COBBS delivered the judgment of the court, with opinion.
                         Justices Lavin and Pucinski concurred in the judgment and opinion.


**OPINION**

¶ 1    This case comes to us on appeal from an order of the probate division of the circuit court of Cook County, denying a motion by petitioners-appellants Sally J. Berveiler, George J. Cerveny, David A. Corona, Mark T. Kudelka, Eric Hilbert, Thomas M. Lotina, Janet L. Mohr, Nancy G. Storey, Shirley Trevena, and Carol S. Walker (petitioners) to reopen the case and vacate the guardianship and estate plan in the Estate of Audrey Mivelaz (Audrey), a disabled adult. On appeal, petitioners contend that the court erred in denying their motion where (1) the court had subject matter jurisdiction to decide the errors raised in the motion, (2) petitioners had standing as heirs and interested persons, and (3) petitioners were entitled to but were not given notice of the proceedings. For the reasons that follow, we affirm.

¶ 2                                I. BACKGROUND
¶ 3                            A. Guardianship Proceeding
¶ 4              1. Petitions for Appointment of Guardian and Cross-Petitions
¶ 5    On June 13, 2016, Gottlieb Memorial Hospital (Gottlieb) filed a Petition for Appointment of Guardian of Disabled Person in the probate division of the circuit court of Cook County. The petition requested that the Office of the Cook County Public Guardian (Public Guardian) be appointed as the guardian of the estate and person of Audrey. In support, the petition stated that Audrey was a patient at Gottlieb and required guardianship because she was a disabled person due to her "dementia," was unable to take care of herself, required 24-hour supervision, and was "unable to make healthcare or financial decisions." Attached to the petition was exhibit A, which identified Audrey's husband, William, as Audrey's nearest relative, who also had dementia. No other relatives were identified in the petition. Gottlieb also filed a petition seeking to appoint the Public Guardian as the temporary guardian of the estate and person of Audrey.[1]

---

[1]Both the petitions for appointment of guardian and temporary guardian of the estate were filed on behalf of Gottlieb by Jodi Palmer, a risk manager at Gottlieb.

¶ 6 On June 16, 2016, Joseph W. Pieper, the duly appointed guardian *ad litem* (GAL), filed his GAL report. That day, the court appointed the Public Guardian as the temporary guardian of the estate and person of Audrey. On July 21, 2016, Gottlieb filed an amended exhibit A, listing James Mivelaz, Scott Denison, Rosemary Denison, and David Mivelaz as Audrey's adult children. Gottlieb then filed a second amended exhibit A, which no longer listed the adult children but identified James, David, and Rosemary as Audrey's adult brothers-in-law and sister-in-law.

¶ 7 On August 2, 2016, Raphael Juss and Phyllis Jaffe, Audrey's friends of nearly 50 years, filed a cross-petition to be appointed as coguardians of the person of Audrey. On August 4, 2016, Audrey's great-niece-in-law, Brittany Bierly, also filed a cross-petition seeking guardianship of Audrey. Attached to her cross-petition was exhibit A, which listed William as Audrey's nearest relative. No other relatives were identified.

## 2. Appointment of Guardians

¶ 8

¶ 9 On October 6, 2016, the court entered an order appointing Fifth Third Bank as the Plenary Guardian of the Estate of Audrey (PGOE). The order stated that Gottlieb's petition was "amended on its face to seek to appoint Fifth Third Bank as guardian of the estate instead of the Office of the Public Guardian." That same day, Juss and Jaffe were appointed as Plenary Co-Guardians of Audrey's Person (PGOPs).[2]

## B. The Estate Plan

¶ 10

### 1. Petition for Instructions Regarding Division of Assets

¶ 11

¶ 12 At some point, the PGOE filed a petition for "instructions regarding the division of the disabled person's assets, maintaining beneficiary designations, and for authority to investigate the testamentary capacity of the Disabled Person." The petition stated that Audrey's account was held in joint tenancy with William and, aside from this account, she had "no known estate planning documents of any kind and no estate plan." Because the PGOE could not maintain the joint account as a guardianship asset, it sought "instructions and authority [from the court] to divide [Audrey's] bank accounts equally in two halves" with "one half of these accounts in the name of the [William's estate]." The PGOE also sought authority to make Audrey's accounts payable upon her death to William and to hire a physician to investigate Audrey's testamentary capacity to execute an estate plan.

¶ 13 On November 30, 2016, the court authorized the PGOE to separate Audrey's joint tenancy accounts with William, divide the accounts equally, and place the funds in separate accounts with William as the beneficiary. Additionally, the court permitted the PGOE to investigate and determine Audrey's testamentary capacity and expend funds to hire a physician for said evaluation. In April 2017, William passed away and his estate was received by Audrey's PGOE.

---

[2]William was also under guardianship. Bierly was appointed as his PGOP, and Fifth Third Bank appointed as his PGOE.

¶ 14                            2. Petition to Create Estate Plan

¶ 15        On September 4, 2018, the PGOE filed with the court a Petition to Create Estate Plan. The petition noted that Audrey did not have "any known existing Will or Trust(s)" and that as of September 30, 2017, the value of Audrey's estate was approximately $9,276,390.87, with an estimated annual income of approximately $157,629.63. The estate included property located in Elmwood Park, Illinois. The petition stated that Audrey had been evaluated to determine her testamentary capacity. On January 31, 2018, Dr. Benedict Gierl conducted an evaluation and opined that Audrey was "capable of knowing what she is doing to make out a Will and has testamentary capacity." However, based on a later cognitive evaluation, Dr. Geoffrey Shaw opined that "because [Audrey's] dementia is of such severity she continues to lack capacity to make any personal or financial decisions, including a lack of testamentary capacity." The PGOE then requested that the court (1) grant the Petition to Create an Estate Plan, (2) hold a hearing to determine Audrey's testamentary capacity, (3) direct the "[GAL] to visit [Audrey] to determine her testamentary capacity and report the same," (4) hold a best interests hearing to establish "an estate plan for [Audrey] and the proper beneficiaries" in the event that the court found Audrey lacked testamentary capacity, and (5) authorize and direct the PGOE "to investigate [Audrey's] Estate Plan while taking into account [her] subjective wishes and best interests."

¶ 16        On September 6, 2018, the PGOE filed an amended notice of petition which stated that it would present, *inter alia*, the Petition to Create Estate Plan and Petition for Instructions and to Confirm Authority before the court, copies of which were attached and served to the GAL, PGOPs, and the Cook County State's Attorney Office on behalf of unknown heirs.

¶ 17        On October 2, 2018, the court entered an order setting hearing dates on the Petition to Create Estate Plan for October 31, 2018, and November 1 and 2, 2018, with continuing hearing dates of November 27 and 28, 2018. The order further authorized the PGOE to "conduct depositions and issue discovery and investigate all aspects of said Petition."

¶ 18        On October 29, 2018, Juss filed an affidavit of heirship to assist the court in its determination of estate planning. Therein, Juss averred that Audrey was married to William, who passed away in April 2017. No children were born or adopted during their marriage or by Audrey at any point. "Audrey never had contact since [Juss had] known her with any of her relatives besides her parents, brother and husband. She never mentioned that she knew any other relatives." Audrey's parents and her brother were deceased. Audrey's brother was "never married and never had children born to or adopted by him at any point." Juss did not know the names of Audrey's grandparents or whether they had any children aside from Audrey's parents. Juss averred that Audrey's "heirs at law when [she] passes away would be unknown to [him]."

¶ 19        On October 30, 2018, the PGOE filed a certificate of publication, which confirmed that notice of the petition to create estate plan was given to Audrey's unknown heirs on October 15, 22, and 29, 2018, and notified them that a default judgment may be entered against them if they failed to answer the petition or otherwise make their appearance on or before November 14, 2018.


¶ 20                               3. Petition for Instructions

¶ 21        That same day, on October 30, 2018, the PGOE filed a status report and petition for instructions (petition for instructions) informing the guardianship court of the status of its

- 4 -

investigation. The PGOE informed the court that it "issued numerous subpoenas to various doctors and medical professionals, medical institutions and financial institutions, as well as nursing homes and assisted living facilities." Specifically, the PGOE issued subpoenas to (1) eight financial institutions, seeking "financial statements related to [Audrey]"; (2) seven healthcare facilities and providers, seeking "medical documents relating to [Audrey]"; (3) AT&T for Audrey's phone records; (4) Adult Protective Services (APS), seeking documents and reports related to Audrey; (5) Lutheran Home and Silverado (care facilities), requesting information relative to the evaluation, care, and treatment of Audrey; and (6) Selfhelp Home, requesting information relative to the evaluation, care, and treatment of Audrey. The PGOE also submitted a Freedom of Information Act (5 ILCS 140/1 *et seq.* (West 2016)) request to the Village of Elmwood Park, seeking police reports, emergency medical services reports, and other documents related to Audrey. The PGOE received responses from two financial institutions, three healthcare facilities and providers, Elmwood Park, APS, and Selfhelp Home. The PGOE received no response from AT&T, Lutheran Home, and Silverado.

¶ 22    The Petition for Instructions further provided that the PGOE had issued subpoenas for the depositions of 11 individuals, 10 of which had been deposed. However, the PGOE had received only two transcripts. Further, there were numerous other potential witnesses disclosed during discovery who could potentially provide relevant information. Lastly, the PGOE had issued written discovery requests to the PGOPs, who provided a response. The PGOE then sought from the court "instructions or directions as to how to proceed with the upcoming trial pending the on-going investigation and discovery" and "instructions as to what, if any, additional evidence should be gathered for the upcoming trial."

¶ 23                                   4. October 31, 2018, Hearing

¶ 24    At the October 31, 2018, hearing, Pieper, in his position as the GAL, testified that he had met Audrey twice: once in June 2016 and again in September 2018. In June 2016, he advised Audrey of her rights and asked her questions. Pieper asked Audrey about her family, and she told him that her husband was her only family member. Audrey stated that her family members had passed away but did not "specify anyone individually." Pieper testified that he had the opportunity to review a physician's report either before or after his visit, and the report indicated that Audrey was "totally disabled." During his interview with Audrey, there was no indication that the physician's report was incorrect, and Pieper opined that she needed a guardian.

¶ 25    The focus of Pieper's second visit was on Audrey's "testamentary capacity." Pieper testified that he spoke with Audrey for about 20 to 25 minutes. He was informed that Audrey had no relatives in the country and "whatever relatives she might have would be in Europe where she was from." He asked her if she had any living relatives, and she told him that she had an uncle. When asked when she last spoke to her uncle, Audrey stated "the other day." Pieper concluded that "it [was] impossible that she talked to her uncle since she's 90 [years old]." Audrey told him that she had relatives in the country but could not name any. He asked her "what the legal intent of a will was," and she responded that "it gives away your money after you die." Pieper then asked if she knew the net worth of her estate, to which she responded "$9 million." Audrey was also asked who she wanted to give her money to in her will, to which she responded "Rose Gordon, [Jaffe], and Ju Ju [*i.e.*, Juss], and Red Cross." Aside from her uncle, Audrey did not mention any other family members during their discussion. In preparing

his second visit report, Pieper had the opportunity to review the medical reports of Dr. Gierl, Dr. Shaw, and Dr. Lance Holemon, all of whom opined that Audrey did not have testamentary capacity. Based on the interview with Audrey and the medical reports, Pieper concluded that Audrey did not have testamentary capacity.

¶ 26 After the hearing, the court found that Audrey lacked testamentary capacity. An order was entered providing that the matter "shall proceed for a best interest hearing as to the proper beneficiaries of an estate plan for [Audrey]." The court also entered a separate order authorizing the PGOE to expend estate assets to hire a private investigator and a genealogist and/or heir finder.

¶ 27 ### 5. Supplemental Report

¶ 28 On November 19, 2018, the PGOE filed its supplemental report to petition for instructions (supplemental report). The PGOE informed the court that it had not received responses from (1) two of the eight financial institutions subpoenaed, (2) one of the seven healthcare facilities and providers subpoenaed, (3) AT&T, and (4) Lutheran Home and Silverado. The supplemental report further stated that the PGOE had completed deposing 10 of the 11 witnesses and subpoenas were issued for the depositions of three other individuals, identified as "relatives of [Audrey's] deceased husband *** believed [to] possess knowledge of [Audrey's] family, as well as her husband's family." These depositions were scheduled to take place on November 19, 2018. The supplemental report also stated that the PGOE had contacted Audrey's purported first cousins once removed, who provided information and documents regarding other family members. The PGOE retained the services of a genealogist and provided her with all the documents. However, as of November 16, 2018, the PGOE had not received an update from the genealogist. Trial subpoenas were also issued to nine of Audrey's purported relatives and a former neighbor for their testimony as witnesses at trial. The PGOE again sought from the court "instructions or directions as to how to proceed with the upcoming trial pending the on-going investigation and discovery" and "instructions as to what, if any, additional evidence should be gathered for the upcoming trial."

¶ 29 On November 20, 2018, the court approved the PGOE's petition for instructions and supplemental report and ordered that "the matter shall continue to trial on November 26, 2018 *** and continuing thereafter."

¶ 30 On November 21, 2018, Aimee Repking and Leslie Lotina, through attorney David Susman, entered an appearance. Both Repking and Lotina were Audrey's paternal first cousins once removed.

¶ 31 ### 6. Hearings and Direction Petition

¶ 32 At the November 26, 2018, hearing, attorneys appeared on behalf of heirs apparent. Attorney Susman appeared in court on behalf of Repking, Lotina, and two other heirs apparent. Attorney Virginia Prihoda appeared on behalf of nine heirs apparent. Attorney Prihoda argued that the "statute *** provides that the ability to [create and modify] an estate plan for a disabled person *** should be based on the threshold consideration of what's in the best interest of the ward." However, she noted that she did not know "[t]hat's what we're doing now" because there was no "notice of the pendency of these proceedings" and she could not determine "that anything is in the best interest of the ward since apparently testimony and things have gone on without our knowledge." The PGOE responded that it "did publish" and then also provided

details of its investigation. The PGOE stated that it identified putative heirs; did "engagement last week"; identified a "potential heir, who's going to take the stand tomorrow"; and "there's one heir that is going to speak tomorrow that has additional information." The court stated that it was "going to try to limit the testimony to issues that are what is in the ward's best interest at this particular time." The PGOE also informed the court that a genealogist report was expected to be completed that day and would be sent to the "counsel who's here today" to confirm the information. The hearing then proceeded with the witness testimonies of Sister Mary Goeckel, Jaffe, and Gordon (friend of Audrey).

¶ 33     The hearing was continued the next day. Attorney Rozenzeit appeared on behalf of three subpoenaed witnesses. Attorneys Susman and Prihoda were also present. Attorney Prihoda stated that she was "representing nine intestate heirs apparent solely for the purpose of objecting to the proceeding."

¶ 34     After hearing evidence of Audrey's possible testamentary wishes, counsel for the PGOPs provided the PGOE with a recommendation that Audrey's estate plan deviate from intestacy. The recommendation provided for "bequests to certain charities important to the disabled person and those who have a consistent and loving relationship with the disabled."

¶ 35     At the November 28, 2018, hearing, witnesses Juss and Pieper testified. That same day, the PGOE filed its verified petition for direction regarding estate planning on behalf of the ward (direction petition). In its direction petition, the PGOE informed the court, *inter alia*, that "as a corporate guardian, [the PGOE] is a mere stakeholder in this matter and [could not] discern what [Audrey's] wishes would be" and, therefore, had "sought [d]irection from the [PGOPs]." The PGOE further noted that it did not have contact information for many of Audrey's potential heirs, despite providing notice to unknown heirs and some potential heirs identified by the PGOE's investigation. As such, the PGOE was "relying on [the court] to determine the appropriateness of deviations from intestacy" and sought the court's "direction as to how to proceed regarding any further estate planning."

¶ 36     Attached to the direction petition was a proposed revocable trust agreement and a pour-over last will and testament. The trust agreement provided that the "[s]ettlor is desirous of creating this Trust for the primary benefit of Audrey *** during her lifetime and, upon her death, for the benefit of the beneficiaries stated herein." The trust agreement stated that "[u]pon the death of Audrey, after payment of the debts and claims, *** the Trustee shall divide the Trust Estate." Specifically, after distribution of personal and household bequests, the trustee shall distribute the residue of the trust as follows: $100,000 to the Carmelite Monastery; $100,000 to the American Red Cross; 2/3 of the residue to Gordon, Juss, and Jaffee, or their survivors; and 1/2 of the residue to Rosemary, if living, or if not living, then to her estate. That same day, the guardianship court ordered that no further investigation was required by the PGOE and the matter was continued.

¶ 37                              C. December 14, 2018, Order

¶ 38     At the December 14, 2018, hearing, the court ruled on the direction petition. The court found that it was in Audrey's "best interests to deviate from intestacy and include those individuals who had consistently [*sic*], loving, and a lasting relationship with Audrey and to exclude certain family members who did not." The court found that it was "clear that Audrey wanted to reward those people who were close to her and assisted with her care." Accordingly, the court entered an order granting the direction petition and accepting the recommendations

of the PGOPs and GAL. The court directed the PGOE to "execute the estate plan according to those recommendations, and fund the trust."

¶ 39                                             D. Audrey's Will

¶ 40        Audrey passed away on February 28, 2019. On April 4, 2019, Audrey's will was admitted to probate, and the PGOE was appointed executor of Audrey's estate. On April 12, 2019, the court approved the third and final account, discharged the guardians, and closed Audrey's estate. Subsequently, petitioners filed a petition to contest the will and trust in the probate estate.

¶ 41                                      E. Motion to Reopen and Vacate

¶ 42        On October 3, 2019, pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2018)), petitioners filed their motion to reopen the case and vacate guardianship and the estate plan (Motion to Reopen and Vacate), by and through their attorneys, FMS Law Group LLC and Tarick Loutfi & Associates.[3] The motion was submitted by Paul Franciszkowicz of FMS Law Group LLC, one of the attorneys for petitioners, and identified Tarick Loutfi of Tarick Loutfi & Associates as the other attorney.

¶ 43        Petitioners argued that the guardianship order is void and "all [o]rders entered in this matter subsequent to the guardianship orders are likewise void and must be vacated" because Gottlieb, the PGOPs, and Bierly did not make reasonable efforts to ascertain or notify Audrey's nearest relatives of their respective petitions.

¶ 44        With respect to their motion to vacate the estate plan orders, petitioners argued that they exercised due diligence in filing the section 2-1401 motion within two years of entry of the order directing creation of the estate plan. Petitioners maintained that their claim was meritorious, as the PGOE failed to provide proper notice to Audrey's nearest relatives and failed to provide them an opportunity to participate in the hearing. Petitioners contended that they could not exercise diligence in bringing their claim to the attention of the court because they were not notified of the proceedings.

¶ 45        Petitioners further argued that (1) the court's December 14, 2018, order must be vacated because the court misapplied the holding of *In re Estate of Rivera*, 2018 IL App (1st) 171214, (2) the order ignored Audrey's intent, (3) the court failed to apply the Dead Man's Act (735 ILCS 5/8-201 (West 2016)) to bar the PGOPs' testimony regarding Audrey's testamentary wishes, (4) the court improperly allowed the GAL to argue and participate in the hearing after allowing him to testify as a witness, and (5) their right to due process and fair hearing was violated. Accordingly, petitioners requested that the court vacate the guardianship orders due to jurisdictional defect, vacate orders creating the estate plan, and vacate its December 14, 2018, order granting the direction petition.

_____

[3]Petitioners filed the motion in their "capacity as nearest relatives of Audrey." The motion did not further specify the relationship between petitioners and Audrey.

- 8 -

¶ 46                                    F. Motion to Strike and Dismiss

¶ 47      On November 15, 2019, the PGOE filed a response to the motion to reopen the case and vacate he guardianship and estate plan, along with a motion to strike and dismiss pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2018)). The other respondents—consisting of Jaffe, Juss, Rosemary, and Gordon—joined in the motion and response. The PGOE argued that (1) the guardianship court lacked subject matter jurisdiction to rule on the motion where Audrey was deceased and the will had been admitted to probate, (2) petitioners lacked standing, (3) petitioners had no meritorious defense and could not meet the requirements of section 2-1401, and (4) notice had been properly given in the guardianship proceeding and, even though heirs were not entitled to notice regarding the estate planning matters, notice had been given and petitioners took no action.

¶ 48      On December 17, 2019, petitioners filed their combined response to the motion to strike and dismiss and filed their reply to the motion to reopen and vacate. The PGOE filed its reply in support of motion to strike and dismiss.

¶ 49      On January 15, 2020, Loutfi, attorney for petitioners, filed a motion for leave to file additional appearance.

¶ 50                                    G. February 20, 2020, Order

¶ 51      At the February 20, 2020, hearing, the court granted PGOE's motion to strike and dismiss and denied petitioners' motion to reopen the case and vacate the guardianship and estate plan. In doing so, the court found that "the Probate Act was satisfied because the known nearest adult kindred, Audrey's husband, was notified of the guardianship proceeding." The court noted that "[a]ll three petitions for appointment of guardian and all orders appointing plenary guardian were filed and entered while the decedent's spouse was living." Because "the [petitioners] were not known," the court found that they were not required to receive notice. Nevertheless, the court found that petitioners received notice of the hearing on testamentary capacity and best interest. Notice was given via publication to unknown putative heirs and was also served upon the State's Attorney's office on behalf of the unknown heirs. Additionally, the plenary guardians subpoenaed several financial institutions and healthcare providers and deposed 13 people "to ascertain the whereabouts of Audrey's relatives." Next, the court found that petitioners lacked standing to object to the estate plan, as they were not beneficiaries of the trust. In fact, they were not named in Audrey's will or trust and, therefore, had no standing.

¶ 52      The court further stated that it could "determine that the best interest of the ward [would be to deviate] from intestacy and include those who consistently and lovingly had a relationship with the ward." The court then noted that Audrey's close friends provided comfort and care to Audrey, were not motivated by compensation or reward, and became involved when they knew Audrey needed assistance. The court stated that there was only one family member, Bierly, who wanted to assist Audrey but decided to withdraw her cross-petition because of "personal obligations" and "distance between [the two]." The court found that because other family members were estranged from Audrey, they "could provide little if any testimony to the [c]ourt by way of Audrey's best interest or her desire with regard to her estate planning." Finally, the court found that the only available forum for the petitioners would be the decedent's estate and the proper recourse would be to file a will and trust contest, pursuant to the Probate Act of 1975 (Probate Act) 755 ILCS 5/1-1 *et seq.* (West 2018)) and have that matter heard in the probate court.

¶ 53    This appeal followed.

¶ 54                              II. ANALYSIS
¶ 55    On appeal, petitioners argue that the court erred in dismissing their motion to reopen and vacate because (1) the court had subject matter jurisdiction to decide the errors raised in the motion, (2) petitioners, as heirs and interested persons, had standing as they were entitled to notice of the estate plan proceedings, (3) petitioners had standing under the "standards of fundamental fairness and due process," which require notice, and (4) petitioners were entitled to but did not receive notice.

¶ 56                         A. Appellate Jurisdiction
¶ 57    We first address respondents' argument that this court lacks jurisdiction over this appeal. Respondents contend that jurisdiction is lacking because attorney Franciszkowicz, counsel for petitioners, did not appear in the guardianship matter and did not seek leave to file his appearance before filing a motion to reopen and vacate. Further, they argue that the "[r]ecord on [a]ppeal indicates that the [motion to reopen and vacate] was filed without the payment of the required fees to the Clerk of the Circuit Court of Cook County."

¶ 58    Respondents state that "[a]t the first court date involving the [motion to reopen and vacate] on November 19, 2019, attorney for [respondents] alerted the court that *** Franciszkowicz, did not have an appearance and had not sought leave to appear" but the court made no ruling on the issue. The case proceeded with briefing and responses on the motion to reopen and vacate until the hearing on the motion on February 20, 2020. At that hearing, respondents again pointed out that attorney Franciszkowicz had no appearance on file.

¶ 59    In response to respondent's jurisdictional challenge, petitioners argue that "given counsel for *** Juss, Jaffe, and Gordon, individually, himself failed to file an appearance in the guardianship court, he is judicially estopped from accusing [petitioners'] counsel flagrant disregard for the jurisdiction of both the guardianship court and this court." Neither respondents nor petitioners cite any case law to support their respective positions.

¶ 60    Before proceeding, we pause to admonish both parties that Illinois Supreme Court Rules require the parties to support their arguments on appeal with citation to authority. See Ill. S. Ct. R. 341(h)(7), (i) (eff. May 25, 2018). This court is not a repository into which a party may dump the burden of research. *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 720 (2010). Nevertheless, a reviewing court has a duty to ascertain its jurisdiction before proceeding in an action on appeal, and we must dismiss an appeal if jurisdiction is lacking. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 251-52 (2010). Accordingly, and for that reason, we will address respondents' jurisdictional challenge.

¶ 61    We view respondents' argument as a challenge to the circuit court's subject matter jurisdiction. "Subject matter jurisdiction refers to the power of the court to adjudge concerning the general questions involved [citation], as well as the power to grant the particular relief requested [citations]." *In re M.M.*, 156 Ill. 2d 53, 64 (1993). With the exception of administrative review actions, where jurisdiction is conferred upon the circuit court by the legislature, the circuit court's jurisdiction is derived directly from the constitution and not from any statute. See Ill. Const. 1970, art. VI, § 9; *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002). "[I]n order to invoke the subject matter jurisdiction

of the circuit court, a plaintiff's case, as framed by the complaint or petition, must present a justiciable matter." *Belleville Toyota, Inc.*, 199 Ill. 2d at 334. "[T]he fact that the litigants or the court may have deviated from requirements established by the legislature does not operate to divest the court of jurisdiction." *McCormick v. Robertson*, 2015 IL 118230, ¶ 22.

¶ 62        Illinois Supreme Court Rule 13(c)(1) (eff. July 1, 2017) governs appearances and provides that an "attorney shall file a written appearance or other pleading before addressing the court unless the attorney is presenting a motion for leave to appear by intervention or otherwise." Local rule 1.4(a) of the circuit court of Cook County includes similar language. See Cook County Cir. Ct. R. 1.4.(a) (Dec. 15, 1982) ("An attorney shall file his appearance before he addresses the court unless he is presenting a motion for leave to appear by intervention or otherwise."). The purpose of an appearance is to "inform the court and the parties of who is properly representing each party and where that person may be served with notice." *Tobias v. King*, 84 Ill. App. 3d 998, 1001 (1980). Generally, an attorney is not required to obtain leave of court to enter an appearance for a litigant. *Sullivan v. Eichmann*, 213 Ill. 2d 82, 90 (2004). This is true even when the litigant is already represented by another attorney. *Id.* at 90-91.

¶ 63        We have often reminded parties that our supreme court rules have the force of law. *Mabry v. Boler*, 2012 IL App (1st) 111464, ¶ 24. They are not mere suggestions, and adherence is mandated. *Id.* Thus, prior to Franciszkowicz addressing the court in this matter, he was required by rule to file his appearance. Even so, we know of no rule, supreme court or otherwise, for which noncompliance can divest the circuit court of the adjudicatory power vested in it by the constitution. Although the failure to file an appearance violates both supreme court and local rules, that failing, like the failure to follow a legislative requirement, had no effect on the court's jurisdiction. See, *e.g.*, *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 530 (2001) (holding that as the circuit court is a court of general jurisdiction, it need not look to statute for its jurisdiction). Thus, Franciszkowicz's failure to file an appearance did not defeat the circuit court's jurisdiction and, therefore, stands as no impediment to ours. Neither, by the way, did the failure to file an appearance affect the validity of petitioners' motion to reopen and vacate. See *Larson v. Pederson*, 349 Ill. App. 3d 203, 206 (2004) (a motion filed by an attorney who had not filed an appearance was not a nullity). Moreover, on January 15, 2020, prior to the proceeding and ruling on the motion to reopen and vacate, attorney Loutfi had filed an additional appearance on behalf of petitioners. As such, an attorney appearance was entered.

¶ 64        We note in passing that respondents appear to have received all pleadings from petitioners' attorneys, including attorney Franciszkowicz, and respondents were also able to tender their pleadings to petitioners by providing notice to attorney Franciszkowicz and others. Thus, even though allegedly out of compliance with the rules, respondents appear not to have been prejudiced. *Id.*

¶ 65        The issue of the court's subject matter jurisdiction arises again in petitioners' later argument, and we will have the occasion to further address its meaning in the context of that analysis. Suffice it to say here, however, that an attorney's failure to file an appearance does not divest the circuit court of subject matter jurisdiction. Having determined that jurisdiction is proper, we proceed with our analysis.

¶ 66                                B. Standard of Review

¶ 67        Prior to addressing the merits of petitioners' claims, we must first determine our standard of review. This appeal challenges the grant of respondents' section 2-619 motion to dismiss.

- 11 -

Section 2-619 of the Code provides for the involuntary dismissal of a cause of action based on certain defects or defenses. 735 ILCS 5/2-619 (West 2018). Section 2-619(a)(1) allows for dismissal of an action if the court lacks subject matter jurisdiction. *Id.* § 2-619(a)(1). Another enumerated ground for a section 2-619 dismissal is that the claim is barred by an "affirmative matter avoiding the legal effect of or defeating the claim." *Id.* § 2-619(a)(9). Lack of standing constitutes an "affirmative matter" that can be asserted under section 2-619(a)(9). *In re Estate of Schlenker*, 209 Ill. 2d 456, 461 (2004). A plaintiff need not allege facts establishing that he has standing to proceed; rather, it is the defendant's burden to plead and prove lack of standing. *Id.* We review *de novo* the court's decision to grant or deny a section 2-619 motion to dismiss. *Lacey v. Village of Palatine*, 232 Ill. 2d 349, 359 (2009).

¶ 68                                    C. Subject Matter Jurisdiction

¶ 69        We next address the circuit court's ruling that it lacked jurisdiction to consider petitioners' motion to reopen and vacate the guardianship and the estate plan. Petitioners argue that the court, in reliance on *In re Estate of Gebis*, 186 Ill. 2d 188 (1999), incorrectly determined that it lacked subject matter jurisdiction to adjudicate petitioners' claims. We earlier set forth principles regarding subject matter jurisdiction, and thus, will not repeat those here. Prior to discussing *Gebis*, however, we set forth the following additional principles. Subject matter jurisdiction refers to a court's power to both adjudicate the general question involved and to grant the relief requested. *In re M.M.*, 156 Ill. 2d at 64. Pursuant to the 1964 amendments to the Illinois Constitution, circuit courts "shall have unlimited original jurisdiction of all justiciable matters." Ill. Const. 1870, art. VI, § 9 (amended 1964).

¶ 70        In *Gebis*, our supreme court determined whether the court has subject matter jurisdiction in a guardianship estate for a disabled person after the ward dies. 186 Ill. 2d 188. There, a son and daughter were appointed coguardians of their mother, who was adjudicated disabled. *Id.* at 191. After the mother passed away, the son filed a statutory custodial claim in the guardianship estate, requesting compensation for her care. *Id.* The sister moved to dismiss, and the trial court granted the motion, holding that the statutory provision relied upon by the son was unconstitutional. *Id.* at 191-92. On appeal, our supreme court, *sua sponte*, considered "whether the trial court possessed subject matter jurisdiction to adjudicate [the son's] statutory custodial claim." *Id.* at 192. Finding jurisdiction to be lacking, the court noted the general rule that "upon the ward's death, both the guardianship and the trial court's jurisdiction to supervise the ward's estate necessarily terminate." *Id.* at 193.

¶ 71        The *Gebis* court reasoned that although the legislature may not limit the circuit court's original jurisdiction to hear a justiciable matter, it may create a justiciable matter by creating rights or duties that have no counterpart in law or equity. *Id.* at 192. The court further noted that in this circumstance, although the circuit court's original jurisdiction to adjudicate the matter derived from the constitution, the justiciable matter itself was defined by the legislature. *Id.* (citing *In re M.M.*, 156 Ill. 2d at 65). Further, the court opined, "[t]he legislature may define the 'justiciable matter' in such a way as to limit or preclude the circuit court's authority." *Id.* at 192-93. "When the circuit court's power to act is controlled by statute, the circuit court is governed by the rules of limited jurisdiction" and must proceed within the parameters of the statute. *Id.* at 193. Accordingly, "[o]nce a disabled person dies, the guardianship terminates and the court supervising the guardianship estate loses jurisdiction to adjudicate *a claim filed*

*against that estate. The decedent's estate is the only avenue for recovery.*" (Emphasis added.) *Id.* at 194.

¶ 72    Following *Gebis*, our supreme court decided *Steinbrecher*, 197 Ill. 2d 514, a case involving sale of property under the Illinois partition act (Act) (735 ILCS 5/17-101 *et seq.* (West 1994)). Relevant here, the *Steinbrecher* court discussed the import of the 1964 amendments to the Illinois Constitution as it relates to the source and scope of the circuit court's jurisdiction. 197 Ill. 2d 514. Briefly, John Steinbrecher filed suit under the Act against his two siblings, one of whom was named Rosemary Steinbrecher, to partition the property. *Id.* at 517. Following a partition trial, the circuit court affirmed an offer of purchase and confirmed the sale. *Id.* at 518. Subsequently, Rosemary filed a motion to stay the judgment as well as a notice of appeal. *Id.* at 518-19. The motion to stay was never perfected, and the notice of appeal was filed 49 days after the circuit court's judgment order. *Id.* at 521.

¶ 73    The appellate court reversed the circuit court's judgment, and the purchaser of the property appealed to the supreme court. *Id.* at 520. On appeal, a majority of the supreme court held that Rosemary's appeal was moot and that the circuit court's jurisdiction was lacking. *Id.* at 528.

¶ 74    Justice Freeman, joined by Justices McMorrow and Kilbride, dissented. *Id.* at 533 (Freeman, J., dissenting, joined by McMorrow and Kilbride, JJ.). In its analysis, the dissenting justices argued that the circuit court lacked authority to order the sale of the property because it had failed to follow the Act, which was fatal to its jurisdiction. *Id.* at 542-43. The dissent argued that the Act gave the circuit court the "inherent authority" to adjudicate the controversy and that the court's failure to adhere to the procedures set forth in the Act divested the court of jurisdiction. *Id.* at 549. Thus, the circuit court's order was void. *Id.*

¶ 75    In response, the majority opined that the 1964 amendments to article VI, section 9, of the Illinois Constitution replaced limited jurisdiction to now vest the circuit court with " 'unlimited original jurisdiction of all justiciable matters.' " *Id.* at 530 (majority opinion) (quoting Ill. Const. 1870, art VI, § 9 (amended 1964) and citing Ill. Const. 1970, art VI, § 9). Noting that the amendment created a single integrated trial court, the majority in *Steinbrecher* held that the "inherent power" requirement applied to courts of limited jurisdiction and administrative agencies. *Id.* Because a circuit court is a court of general jurisdiction, it need not look to a statute for its jurisdictional authority. *Id.*

¶ 76    Since *Steinbrecher*, the jurisdictional analysis in *Gebis* is seemingly on less solid footing. Of particular note is *In re Estate of Ostern*, 2014 IL App (2d) 131236, a case decided by our sister court in the Second District. There, the trial court entered an order establishing a trust (Ostern Trust) for the ward but excluded one of the decedent's children due to her previous exploitation of the ward. *Id.* ¶¶ 4-5. A few years later, petitioners, who were children of the excluded child (*i.e.*, the decedent's grandchildren), moved to vacate the order establishing the trust pursuant to section 2-1401, alleging that the decedent had a preexisting will and trust and that they had not been notified of the motion to create the Ostern Trust. *Id.* ¶¶ 6-7. Relevant here, the petitioners alleged that the court's trust order was void for lack of jurisdiction because they were necessary parties and had not be given notice of the motion. *Id.* ¶ 16. The court agreed and held that because the petitioners, as beneficiaries of the trust, were necessary parties, they were entitled to notice. *Id.* ¶ 19. The failure to notify them rendered the circuit court's order void for lack of jurisdiction over all the necessary parties. *Id.*

¶ 77    The respondents, relying on *Gebis*, argued that the trial court lacked jurisdiction to vacate its order because the decedent had passed away and the court lost its jurisdiction to supervise

- 13 -

the guardianship estate. *Id.* ¶ 28. In rejecting the argument, the court commented that it had "previously called into question the continuing vitality of *Gebis* in light of the supreme court's subsequent holdings in [*Steinbrecher* and other cases]." *Id.* ¶ 29. Then, citing to *Belleville Toyota, Inc.*, 199 Ill. 2d at 334, the court stated, "it is clear that the jurisdiction of the circuit courts of this state comes not from the legislature but from the state constitution." *Ostern*, 2014 IL App (2d) 131236, ¶ 29.

¶ 78    Ultimately, the *Ostern* court held that the trial court had jurisdiction to rule on the petitioners' section 2-1401 petition because "the claim at issue [was] not a claim against the estate, it [was] an assertion of jurisdictional error by the court." *Id.* ¶ 31. In support of its "jurisdictional error" finding, the court cited to *In re Estate of Barth*, 339 Ill. App. 3d 651, 659-61 (2003), a First District case. *Ostern*, 2014 IL App (2d) 131236, ¶¶ 30-31.

¶ 79    In *Barth*, trust beneficiaries (under a prior trust amendment) filed a motion to vacate an agreed order after the ward's death. 339 Ill. App. 3d at 659. The agreed order was entered during the ward's life and declared the ward incompetent, appointed a guardian of estate, invalidated an amendment the ward made to the trust, and permitted distributions. *Id.* at 658. The trial court denied the trust beneficiaries' motion. *Id.* at 655. The plaintiff argued that the trial court no longer had jurisdiction to consider the motion to vacate after the ward's death. *Id.* at 658. In accord with *Gebis*, this court noted that because the guardian is powerless to pay a claim filed against a deceased ward's guardianship estate, " 'the trial court supervising the guardianship estate is powerless to adjudicate such clams, as jurisdiction lies only where the court can grant the particular relief requested.' " *Id.* at 660 (quoting *Gebis*, 186 Ill. 2d at 194). The court noted that when the ward died, the guardianship court's jurisdiction was confined to supervising the preservation of the estate until her will was admitted to probate or letters of administration issued. *Id.* Thereafter, any claims for money or bequests from the estate had to be filed against the estate. *Id.* The court found that the claim at issue (a motion to vacate an agreed order) was not a claim against the estate for money or bequests. *Id.* Rather, it was an assertion of jurisdictional error by the court and, thus, "well within the purview of the guardianship court to grant." *Id.*

¶ 80    In the present case, petitioners' motion was premised on their lack of notice of the proceedings. As such, as in *Barth* and *Ostern*, petitioners' claim is not a claim against the estate but rather an assertion of jurisdictional error by the court. Further, the relief requested by petitioners is within the purview of the circuit court to grant. See *id.* (citing *Gebis*, 186 Ill. 2d at 194). Accordingly, the court had jurisdiction to vacate its February 20, 2020, order.

¶ 81    Respondent Fifth Third Bank argues that *Barth* is distinguishable because the court's ruling there "was grounded on the petitioners' interests in an already existing trust that was extinguished by the trust modifications entered by the court." Similarly, Fifth Third Bank argues that *Ostern* is "distinguishable from the instant case as, unlike in *Ostern*, where the beneficiaries had a present interest in the original trust and were thus necessary parties, [petitioners here] *** had no interest in Audrey's estate because they were never beneficiaries of any trust and, therefore, they were not necessary parties." However, we note, and as we will later discuss, petitioners claim that they are necessary parties by virtue of their status as heirs, and not beneficiaries. Additionally, the *Ostern* court had noted that the result of vacating an order is "to return to the status quo existing prior to the creation of the *** Trust, where the trial court could properly adjudicate the parties' rights as potential heirs or beneficiaries of [the ward's] estate." 2014 IL App (2d) 131236, ¶ 31. As such, we agree with petitioners that the

- 14 -

distinction is not dispositive where petitioners claim to be potential heirs of Audrey and, further, that the distinctions have no bearing on the issue of court's jurisdiction.

¶ 82                                    D. Standing

¶ 83      Petitioners argue that they have standing to challenge the estate plan and initial guardianship proceedings. Petitioners contend that as heirs they are "interested persons" as it related to Audrey's estate planning. As such, they were entitled to receive notice of the proceedings involving the petition to create an estate plan. They further take the position that the Probate Act and "standards of fundamental fairness and due process" require notice and that "failure to provide notice results in vacating the initial guardianship order."

¶ 84      Standing requires an injury in fact to a legally cognizable interest. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492 (1988). The doctrine of standing requires that a party assert his or her own legal rights and interests, rather than the rights and interests of third parties. *In re Estate of Schumann*, 2016 IL App (4th) 150844, ¶ 15. The purpose of the standing requirement is to "ensure[ ] that issues are raised only by parties having a real interest in the outcome of the controversy." (Internal quotation marks omitted.) *Id.*

¶ 85      "Although standing is generally a 'common law concept' [citation], standing under the Probate Act is entirely a creature of statute." *Id.* ¶ 19. Section 11a-18(a-5) of the Probate Act provides that the "probate court, upon petition of a guardian *** and after notice to all persons interested as the court directs, may authorize the guardian to exercise any or all powers over the estate and business affairs of the ward that the ward could exercise if present and not under disability." 755 ILCS 5/11a-18(a-5) (West 2018). Section 1-2.11 of the Probate Act defines "interested person" as "one who has or represents a financial interest, property right or fiduciary status at the time of reference which may be affected by the action, power or proceeding involved, including without limitation an heir, legatee, creditor, person entitled to a spouses' or child's award and the representative." *Id.* § 1-2.11. The statute specifically includes heirs in the definition of "interested persons." The word "heir" refers to a person appointed by law to succeed to the estate in case of intestacy. *Schlenker*, 209 Ill. 2d at 462. In other words, it refers to anyone who would take from a person's estate under the statute of descent and distribution if that person died without leaving a will. *Id.*

¶ 86      We agree with petitioners that as potential heirs, they are "interested parties" under the plain language of the Probate Act and, therefore, entitled to notice of the proceedings involving the petition to create an estate plan. The petitioners, by virtue of being heirs, "always [have] a financial interest created by the potential, however tenuous, of the estate eventually passing by intestacy." *In re Estate of Lay*, 2018 IL App (3d) 170378, ¶ 16 (citing *Schlenker*, 209 Ill. 2d at 466). As such, petitioners have standing to bring forth claims regarding lack of notice regarding the estate plan proceeding, which would affect their interest. See *Schlenker*, 209 Ill. 2d at 461-62 (finding that one's status as an heir is sufficient, in itself, to confer standing).

¶ 87      Citing *In re Estate of Henry*, 396 Ill. App. 3d 88 (2009), respondents contend that petitioners have no standing to raise any arguments because their interest in receiving an inheritance from the decedent's estate did not vest until Audrey's death. Respondents also argue that petitioners have no interest in Audrey's estate plan, as they were never beneficiaries of any trust and were not even legatees in an existing will.

¶ 88      In *Henry*, this court held that a caretaker and executor lacked standing to challenge the court's amendment of a ward's will where their interests in the ward's property would not vest

- 15 -

until the death of the ward. *Id.* at 97-98. The court found that the caretaker and executor lacked standing because the ward was still alive and they had no present vested interest in the assets. *Id.* at 98.

¶ 89 Later, in *In re Estate of Michalak*, 404 Ill. App. 3d 75 (2010), this court distinguished *Henry* and explained why it did not apply in the context of trusts. In *Michalak*, the beneficiaries of a trust were the ward's two neighbors. *Id.* at 78. The validity of the trust was later challenged by the ward's relatives, who obtained a court-ordered amendment removing the neighbors as beneficiaries. *Id.* at 82. The issue on appeal was whether the beneficiaries under the original trust document had standing on appeal to challenge the amendment that removed them as beneficiaries. *Id.* at 82-83. This court held that as beneficiaries of the trust, the neighbors had standing. *Id.* at 84. In doing so, we noted that "[t]he principal distinction between a will and a trust is that in the former, the beneficiary has no interest until the death of the testator, while in the latter, [the] beneficiary has an interest the moment the trust is created." *Id.* at 83. Therefore, the neighbors, as trust beneficiaries, had standing because they had an "equitable remainder interest, which vested immediately upon the creation of the trust." *Id.* at 84.

¶ 90 *Henry* and *Michalak* do not control our disposition here because, as stated, petitioners bring their claim in their capacity as putative heirs and not as beneficiaries of a trust or legatees under a will. An heir's interest is not determined by the contents of a decedent's will or trust, but rather the laws of descent and distribution if the decedent had died intestate (*i.e.*, without a will). It is also crucial to note that petitioners' claims are premised on a lack of notice. As discussed above, the Probate Act requires that notice be provided to all interested persons. As such, we find that petitioners had standing to bring forth their claims pertaining to notice regarding the estate plan.

¶ 91 We conclude differently with respect to the initial guardianship orders, the notice requirements of which are governed by the Probate Act. Initially, we note that, contrary to respondent Fifth Third Bank's assertion, petitioners did not waive their argument on appeal that the initial guardianship orders are void due to insufficient notice. In their opening brief, petitioners clearly argue that the Probate Act and "standards of fundamental fairness and due process" require that "notice of hearing on a petition for adjudication of disability and appointment of a guardian [be given] to the nearest relatives." Because petitioners did not receive such notice, they argue that the initial guardianship orders should be vacated.

¶ 92 Section 11a-8(e) of the Probate Act provides that

"[t]he petition for adjudication of disability and for the appointment of a guardian of the estate or the person or both of an alleged person with a disability must state, if known or reasonably ascertainable *** (e) the name and post office addresses of the nearest relatives of the respondent in the following order: (1) the spouse and adult children, parents and adult brothers and sisters, if any; if none, (2) nearest adult kindred known to the petitioner." 755 ILCS 5/11a-8(e)(1), (2) (West 2018).

¶ 93 The Probate Act further provides that "[n]otice of the time and place of the hearing" be given to "those persons, including the proposed guardian, whose names and addresses appear in the petition." *Id.* § 11a-10(f). Our supreme court has noted that persons required to be given notice pursuant to the Probate Act have standing to file a motion contesting the order adjudging a person disabled and appointing a guardian. *In re Estate of Steinfeld*, 158 Ill. 2d 1, 9-10 (1994).

¶ 94 Section 11a-8(e) of the Probate Act states that notice of the proceedings must be given to the disabled's person's spouse, parents, adult children, or siblings. Only if none exists, then to

- 16 -

the nearest adult kindred known to the petitioner. Here, the petitions for appointment of guardian were filed by Gottlieb and listed Audrey's spouse, William. The court noted that all three petitions for appointment of guardian and all orders appointing plenary guardian were filed and entered while William was living. Thus, the notice requirement of the Probate Act is satisfied, as it was provided to Audrey's spouse. Even if there were no spouse, parents, children, or siblings, section 11a-8(e)(2) requires that the petition should state the nearest adult kindred known to Gottlieb. Although exhibit A of the petition filed by Gottlieb was amended several times to add and later remove adult children, brothers-in-law, and a sister-in-law, the petition did not list petitioners. The record indicates that petitioners were not known or ascertainable to Gottlieb at that time. The Probate Act does not require that notice be given to distant heirs, such as petitioners in this case who were not the nearest adult kindred known to Gottlieb. Therefore, petitioners have no standing with respect to the initial guardianship orders.

¶ 95       Petitioners cite *In re Guardianship Sodini*, 172 Ill. App. 3d 1055 (1988), for the proposition that "failure to give notice to relatives is a jurisdictional defect, and such failure to provide notice results in vacating the initial guardianship order." There, the Sodini's niece had listed his adult sisters in her petition to adjudicate Sodini as a disabled person and to be appointed as his guardian. *Id.* at 1057. However, the niece failed to provide any notice to the sisters. *Id.* Several months after the court adjudicated Sodini as a disabled person and appointed the niece as guardian, one of the sisters filed a motion to vacate the appointment order, alleging that she never received notice. *Id.* The appellate court reversed the trial court's denial of the motion, finding that the legislature, in enacting section 11a-10(f) of the Probate Act, "desired to make service upon those relatives listed in the petition a requirement for obtaining proper jurisdiction." *Id.* at 1059.

¶ 96       *Sodini* is distinguishable from the present case. Unlike the niece's petition that listed Sodini's sisters, Gottlieb's petition did not list petitioners. The cross-petitions filed by the PGOPs and Bierly also did not identify petitioners as the nearest relatives of Audrey. As such, notice was not required upon petitioners who were not listed in the petitions. Therefore, any failure to provide the non-listed petitioners was not a violation of the Probate Act requiring vacatur of the initial guardianship orders.

¶ 97       Petitioners contend that

         "the violation of fundamental fairness and due process is greatly exacerbated by the fact that: (1) non-relatives were appointed as guardians; (2) then allowed to engage in self-dealing by testifying to their own benefit, that they should receive the majority interest in Audrey's estate and Trust; and (3) then while engaging in such self-dealing, actively blocked Audrey's heirs from participating and objecting in hearing."

However, the record shows that the court determined that it would be in the best interests to appoint Audrey's longtime friends rather than estranged relatives as guardians. The court may also deviate from intestacy if it determines that it is in the best interest of the ward. See *Estate of Rivera*, 2018 IL App (1st) 171214, ¶ 44 (providing that the court can deviate from intestacy if it is in the best interest of the ward). With respect to petitioners' argument that respondents engaged in self-dealing by blocking Audrey's heirs, there is nothing in the record to support this. Further, this argument pertains to the rights and interests of the other heirs or third parties who entered appearances in the initial matter rather than the petitioners.

¶ 98       In sum, we find that petitioners had standing to challenge the estate plan proceedings based on lack of notice because, as putative heirs, they are interested persons. However, they had no

standing to challenge the initial guardianship orders because, under the Probate Act, they were not listed on Gottlieb's petition.

¶ 99                                                    E. Notice

¶ 100     Having found that petitioners have standing to challenge the estate plan proceedings, we must determine whether petitioners were given notice. Section 11a-18(a-5) of the Probate Act provides, in relevant part, that the "probate court, upon petition of a guardian, *** and after notice to all other persons interested as the court directs, may authorize the guardian to exercise any or all powers over the estate and business affairs of the ward." 755 ILCS 5/11a-18(a-5) (West 2018). Section 11a-18(a-5) clearly provides the court with discretion as to notice, stating that "notice to all other persons interested" should be given "as the court directs."

¶ 101     Here, the PGOE served the estate plan petition on the Cook County State's Attorney's office on behalf of unknown heirs and notified Audrey's unknown heirs of the pending estate plan proceedings via publication. Contrary to petitioners' assertion, notice was given to petitioners who were not ascertainable at that time. In addition, the record shows that the PGOE sought the court's direction as to the petitions and continued its efforts to locate Audrey's heirs. A private investigator and a genealogist were hired to locate the parties. The PGOE also subpoenaed several financial institutions and healthcare providers and deposed roughly 13 individuals to obtain any information pertaining to Audrey's relatives. As such, we find that the petitioners received notice and there were no due process violations.

¶ 102                                               III. CONCLUSION

¶ 103     For the reasons stated, we affirm the judgment of the circuit court.

¶ 104     Affirmed.