2022 IL App (2d) 220118-U
No. 2-22-0118
Order filed November 28, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-217 |
| CHRISTOPHER RODRIGUEZ, | ) ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Brennan and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence sufficiently supported defendant's convictions, and police failure to preserve certain evidence did not require reversal of those convictions.

¶ 2    After a bench trial, the defendant, Christopher Rodriguez, was found guilty of three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2016)) and one count of criminal sexual abuse (*id*. § 11-1.50(a)(2)).  He was sentenced to a total of 13 years' imprisonment.  He appeals, arguing that (1) the State did not prove beyond a reasonable doubt that he knew that the victim, C.R., lacked the ability to consent and (2) the failure by the police to preserve Snapchats amounted to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  We affirm.

¶ 3                                                      I. BACKGROUND

¶ 4      Based on the following events, the defendant was charged with three counts of criminal sexual assault (mouth-to-breast contact, mouth-to-vagina contact, and penis-to-vagina contact) and one count of criminal sexual abuse (insertion of fingers into vagina). On October 17, 2018, sometime between 5 and 8 p.m., C.R. arrived at the home of a friend, Kenneth Strey. Strey's girlfriend was there, as was Strey's roommate, the defendant. The four watched a movie on some couches in Strey's bedroom. At some point after starting a second movie, the group moved to the living room and began playing a drinking game in which players could require others to drink a certain number of drinks. C.R. began by drinking Monacos, a canned alcoholic drink that she described as "really pretty strong." C.R. testified that she then drank a clear liquid provided by the defendant. C.R. "felt really messed up" and "really drunk." She tried to stand but felt "woozy" and could not walk. She asked Strey to help her upstairs so she could lie down and, in the defendant's presence, he did so. She lay down on one of the couches in Strey's bedroom and "just passed out."

¶ 5      The next thing C.R. recalled was waking up on a bed that was not in Strey's room. She testified that she went "in and out of consciousness" and was aware, at various points, of the defendant putting his mouth on her breasts and on her vagina, and him penetrating her vagina with his penis. She also recalled feeling his fingers in her vagina. C.R. testified that, while this was happening, she twice surfaced and said no before passing out again, but the defendant did not stop what he was doing. She then fell to or hit the floor and the defendant grabbed her head and tried to get her to suck his penis. She said "No. What the f***? Where are my pants?" and ran out of the room and down the hall to Strey's bedroom. C.R. told Strey and his girlfriend, who were in bed there, what just happened. She called a friend who lived nearby to come pick her up because

she was too drunk to drive. When her friend arrived, she followed him back to his house in her car and then he took her to the hospital. C.R. still felt "woozy" and "wobbly" when she arrived at the hospital. She did not know what time she arrived, perhaps between 1 and 3 a.m. There, she underwent a sexual assault examination. At trial, she identified as hers a pair of underwear found in the defendant's room.

¶ 6    On cross-examination, C.R. said that she did not recall much of what happened that evening. She was aware of the sensation of the defendant penetrating her with his fingers and kissing her breasts and her vagina. She did not remember the sequence of these events. She said no on at least two separate occasions.

¶ 7    The next witness was a nurse, Kelley Minnick, who worked in the emergency department of Huntley Hospital. She performed a sexual assault examination on C.R. on October 18, 2018. C.R.'s medical records from that date were admitted into evidence. Minnick began interviewing C.R. at about 3:15 a.m. In her notes, Minnick put C.R.'s words in quotation marks. C.R. described what happened and estimated that the assault had taken place about 25 minutes earlier. At the hospital, C.R. was sufficiently aware and coherent to be capable of consenting to each aspect of the physical examination. Minnick collected a urine sample from C.R. at 5:04 a.m. The parties stipulated that the urine sample was tested and showed an alcohol concentration of .096 grams per 67 milliliters.

¶ 8    Detective Theo Kallantzes of the Huntley police department responded to the house shared by Strey and the defendant on October 18, 2018. He identified various photographic exhibits, including photographs of the couch in the defendant's room where C.R.'s underwear was found, and the top of the mini-fridge in the defendant's room, on which there were bourbon bottles and a juice bottle. Kallantzes did not find any clear liquor in the defendant's room. The photographs

were admitted. Kallantzes also interviewed the defendant that day, and the video recording of that interview was played for the court.

¶ 9    The interview began with Kallantzes reviewing the defendant's *Miranda* rights with him and the defendant agreeing to speak. The defendant's first account of what happened after C.R. went upstairs to rest is that he and she had gone to his bedroom, but he couldn't achieve an erection and she left. He then said that C.R. gave him a kiss and took off her pants, and he performed oral sex on her and "tried it again," referring to penetrating her vagina with his penis, but he still could not achieve an erection. He asked her to give him oral sex but she said no and left the room.

¶ 10    The defendant was asked to go back over the events after C.R. was helped upstairs. He agreed that it probably was not C.R.'s intention to have sex with him that night, because they had just met. After the drinking game, C.R. went to sleep on the couch in Strey's room. The defendant said that he came into Strey's room and lay behind C.R. on the couch; they then passed out together. When he woke, he suggested going to his room. He took C.R.'s hand and led her to his room. Asked if she was still drunk at that point, the defendant said "probably," as he himself was still drunk. They lay on his bed and he "made a move," starting to kiss her, and that "led to other things." Asked if she was awake or still out of it, the defendant said that C.R. was "in between," kind of passed out and kind of engaging him. He thought she was willing to do whatever was done because she did not say no. He removed her pants and underwear. She did not say anything. He was kissing her and inserting his fingers into her vagina, trying to arouse himself, but that was not working. He then performed oral sex on her, during which he heard moaning noises but no words. He tried to penetrate her vagina with his penis and the tip may have gone in but his penis was too soft to enter her fully. He flipped her over onto her hands and knees and tried to arouse himself but could not, and flipped her back over again. She got on her knees on the floor and he asked her

to give him oral sex to arouse him, but she said no and he accepted that "it wasn't going to happen." When Kallantzes suggested that, during the sexual encounter, C.R. was not responsive, the defendant implicitly acknowledged that she was not, saying that that was "what happens when you drink." He rolled his head back onto his shoulder demonstratively as he said this. He thought she first became more alert when he performed oral sex on her. The only time he heard her say no (or any words) was when he asked her to perform oral sex on him.

¶ 11 The defense recalled Kallantzes to impeach C.R.'s testimony. Kallantzes testified that, when he interviewed her, C.R. was able to describe the defendant's bedroom accurately and told him that the defendant had moved and repositioned her multiple times during the incident, held her arms down and choked her with his hands, penetrated her anally (among other things), and told her to get on her knees. At trial, C.R. had testified that she did not remember these things and did not recall saying them to anyone.

¶ 12 Strey was the next witness for the defense at trial. Strey had also been interviewed as a witness by the Huntley police on October 18, the same day that C.R. went to the hospital. In large part, Strey corroborated C.R.'s account. He had known C.R. for some time, having met her through a former co-worker. He invited her over to watch movies, and they played a drinking game in which players could direct others to drink. Strey testified that the defendant and C.R. were not flirting but there was "sexual tension-ish" between the two during the drinking game. The defendant went to his room at one point and returned a short time later. C.R. became so intoxicated that, when she asked to lie down, Strey had to help her up the stairs. He put her on a couch in his room. Then he and his girlfriend went to sleep in his bed. His girlfriend woke him up later by initiating a sexual act and he briefly stopped her because he thought C.R. was in the

room. However, when he looked at the couch, C.R. was not there. C.R. walked into the room a short time later.

¶ 13    Several excerpts of the video recording of Strey's October 18, 2018, interview were played during rebuttal for the purpose of impeaching aspects of Strey's testimony. For instance, at trial Strey said that the defendant had helped him walk C.R. up the stairs to Strey's bedroom couch, and that he had seen the defendant come into his room and had seen the defendant and C.R. together on the couch in his bedroom before he went to sleep. During his interview on the day of the incident, however, Strey said that, when he helped C.R. up the stairs, the defendant remained downstairs with Strey's girlfriend. Further, Strey told the police that he never saw the defendant and C.R. on the couch together, and he never saw the defendant come into in his room. Strey also testified at trial that C.R.'s eyes were open and he did not believe that she was asleep when he went to sleep. During the interview, however, when asked where C.R. was when he went to sleep, he said that she was on the couch in his room, asleep. He confirmed in a definite tone of voice that she was "passed out" on the couch in his room and the door was shut when he and his girlfriend went to sleep. At trial, Strey also testified positively that, when C.R. came back to his room, she asked him to retrieve her phone, phone charger, and purse from the defendant's room. During the interview, however, the only item he recalled retrieving from the defendant's room was C.R.'s sock.

¶ 14    Of particular importance, Strey's trial testimony contradicted his earlier statements about what C.R. said when she came back into his room. During his interview, Strey recounted that, when he asked what happened, C.R. told him that the last thing she remembered was going to sleep on the couch in Strey's room, but she awoke to find herself in bed, being touched sexually. She did not know where she was at first but then realized that the defendant was the person touching

her. At trial, however, Strey denied that C.R. said she fell asleep on his couch but woke up in the defendant's room.

¶ 15 In the recording of his police interview, Strey told the police that he had access to a "story" from C.R. on the mobile app Snapchat. A story is a linked set of photos or video clips posted at different times. Like most Snapchat postings, it is permanently deleted after a short period, 24 hours or so. Strey displayed the Snapchat story from C.R. on his phone during the interview. He told Detective Gregorio that it showed them all still watching movies at about 9:15 p.m. and playing the drinking game at about 11:15 p.m. Detective Gregorio asked Strey to save the Snapchat story, but Strey said he could not; the person who posted it (C.R.) was the only person who could do that.

¶ 16 The trial court found the defendant guilty of all counts. It noted that, because the defendant did not contest that he had sexual contact with C.R. of the kind charged, the case turned on whether the State proved that the defendant knew that C.R. was unable to give knowing consent when the sexual contact occurred. The trial court found that it was undisputed that C.R. became extremely intoxicated during the drinking game and that the defendant knew that she had to be assisted upstairs. It was not known exactly how much time elapsed between the end of the drinking game and the sexual encounter. Working backward from C.R.'s examination at the hospital at 3:15 a.m., the trial court found that, despite C.R.'s estimate to the nurse that the sexual encounter had occurred at 2:50 a.m., it was likely that more than 25 minutes passed between the sexual encounter and the examination, and thus the sexual encounter likely occurred closer to 2 a.m. Even without being able to narrow down the exact time of the encounter, however, given C.R.'s alcohol concentration at about 5 a.m., it was reasonable to conclude that the concentration was at least that high and perhaps higher at the time of the encounter. Although the nurse had described C.R.'s

condition at the hospital as alert and coherent enough to answer questions and consent to the sexual assault examination, the impact of the sexual assault could well have increased her level of functioning. Further, in his recorded interview, the defendant had acknowledged that C.R. was not responsive during the encounter, rolling his head onto his shoulder and saying that C.R. was "kind of out of it" and that "that's what happens when you drink." Reviewing the evidence, the trial court found that there was no credible evidence that C.R.'s condition had changed between when she was assisted upstairs and when the sexual encounter occurred, and that the defendant reasonably should have known that C.R. was unable to give knowing consent.

¶ 17 The defendant filed a posttrial motion in which he argued, among other things, that the State committed a *Brady* violation by failing to preserve and produce the Snapchat story that Strey showed the police, as it could have provided exculpatory evidence regarding C.R.'s intoxication level at various times during the evening. The trial court denied the motion, finding that the failure to obtain and preserve the Snapchat story was properly analyzed not under *Brady* but under case law regarding police failure to preserve evidence, which required a finding of bad faith that was not present in this case. The defendant filed a timely notice of appeal.

¶ 18                                    II. ANALYSIS

¶ 19 On appeal, the defendant first argues that the State did not prove, beyond a reasonable doubt, that he knew or should have known that C.R. was unable to give knowing consent to the sexual contact when it occurred.

¶ 20 In evaluating the sufficiency of the evidence, it is not the province of this court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in

original.) *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The weight to be given to the witnesses' testimony, the determination of their credibility, and the reasonable inferences to be drawn from the evidence are all matters within the jurisdiction of the trier of fact. *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *Collins*, 106 Ill. 2d at 261-62. Likewise, the resolution of any conflicts or inconsistencies in the evidence is also within the province of the fact finder. *Collins*, 106 Ill. 2d at 261-62. We will set aside a criminal conviction only "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Smith*, 185 Ill. 2d at 542.

¶ 21 The defendant argues that various pieces of evidence undermined the trial court's finding of guilt. For instance, Strey testified that two or three hours passed between when C.R. fell asleep on the couch and when she returned to his bedroom. The defendant argues that the trial court "failed to acknowledge" that testimony or the inference it raised—that, by the time of the sexual encounter, C.R. was no longer so intoxicated that she was incapable of consent. He also points to evidence that C.R. was able to "run" down the hall to Strey's bedroom after the encounter, was able to call a friend and then to drive her car to that friend's house, and was coherent and functioning during her interactions with the nurse at the hospital. We reject this argument.

¶ 22 Initially, we note that the trial court was free to find that Strey's testimony was not credible, and in fact several aspects of that testimony were impeached. More significantly, however, the record demonstrates that the trial court considered all of the evidence the defendant points to but simply reached a different conclusion based on other evidence. The trial court's estimate that the sexual encounter likely occurred around 2 a.m. was consistent both with the Snapchat story showing that the group was still playing the drinking game at 11:15 p.m. (as captured when Strey

showed the police that Snapchat story during his videorecorded interview) and Strey's estimate that C.R. came back into his room between two and three hours after he went to bed.

¶ 23    Moreover, the trial court's remarks show that it gave due weight to the defendant's argument that C.R. had regained the ability to give knowing consent in the interim.  However, the trial court ultimately found more significant other evidence that C.R. remained highly intoxicated during and even after the sexual encounter.  The trial court noted that C.R.'s urine test showed a high alcohol concentration almost two hours after her sexual assault examination.  That fact, paired with undisputed evidence that when she went upstairs she was unable to walk by herself, suggested that she was extremely intoxicated both before and after the sexual encounter.

¶ 24    Nor did the trial court rely only on C.R.'s urine test results (which, as the defendant points out, were admitted without the benefit of expert testimony as to their relevance in establishing C.R.'s level of intoxication earlier).  The trial court's conclusion that the defendant knew or reasonably should have known that C.R. was not capable of giving knowing consent was supported by both C.R.'s testimony and the defendant's statement to police.  C.R., of course, testified that she "passed out" after being helped upstairs, did not regain consciousness at all until she awoke to find herself on the defendant's bed with him touching her sexually, and even then could not remain conscious, drifting in and out until she fell to the floor.  The defendant argues that her testimony was not credible because she did not remember several aspects of the sexual encounter.  A hazy memory of events is a well-documented effect of intoxication, however, and C.R.'s inability to remember certain details was not inconsistent with her account of still being highly intoxicated. Moreover, several of the things C.R. told people right after the event but could not remember at trial were corroborated by the defendant's own statement.  For instance, although at trial C.R. did not remember telling people that the defendant had repositioned her several times and may have

tried to penetrate her anally, the defendant told police that he repositioned C.R. several times, including placing her on her hands and knees to try "doggy style," a position consistent with C.R.'s perception of anal contact. The record does not undermine the trial court's acceptance of C.R.'s testimony.

¶ 25    The defendant's statement also provided ample support for the trial court's finding that he reasonably should have known that C.R. could not knowingly consent. Although he initially told police that C.R. starting kissing him and took her own pants off, he then gave a different account when asked to provide more detail. His later account acknowledged that he initiated essentially all of the sexual contact, including suggesting that C.R. come to his bedroom and taking her by the hand to lead her there, removing her clothing and "making his move," kissing her breasts, inserting his fingers into her vagina, performing oral sex on her, trying to penetrate her vagina with his penis, arranging her body in different positions in an attempt to become aroused, and asking her to perform oral sex on him. Although he told police that C.R. was kind of "engaging" with him, the only example he gave of that was her kissing with him at some point and making nonverbal noises while he was performing oral sex on her. He did not describe C.R. participating in any other way, such as by moving her own hands or body, or uttering any words at all until she refused to perform oral sex on him shortly before leaving the room. He also admitted that he knew she was probably still drunk when he took her to his room and that, when he was touching her sexually, she was "in between" and was kind of passed out. Given all of this evidence, the record amply supports the defendant's convictions.

¶ 26    In support of his argument, the defendant cites *People v. Roldan*, 2015 IL App (1st) 131962, ¶ 21, in which the court held that evidence that the victim consumed alcohol, without more, was not sufficient to show that she was not able to consent to sexual contact. That case

involves different facts, however. In *Roldan*, the sole evidence that the defendant knew the victim could not knowingly consent was that he knew she was intoxicated earlier in the evening. *Id*. ¶ 20. However, despite being intoxicated, the victim was able to walk to a nearby drug store, get into a car with the defendant, and walk back to the house without assistance; other witnesses testified that the victim was walking and talking normally; and the victim never blacked out. *Id*. ¶ 23. Here, by contrast, C.R. could not walk without assistance and passed out before the sexual encounter took place, and both she and the defendant said that she was still drunk and "kind of passed out" during the sexual encounter itself. *Roldan* thus does not assist the defendant.

¶ 27 Viewing the evidence in the light most favorable to the State, as we are required to do (*Collins*, 106 Ill. 2d at 261), the defendant's convictions were sufficiently supported by the evidence.

¶ 28 The defendant's second argument on appeal is that the State committed a *Brady* violation by failing to preserve and tender the Snapchat story that C.R. created on the evening of the assault. This argument lacks merit.

¶ 29 In *Brady*, 373 U.S. 83, the United States Supreme Court held that a defendant's due process rights are violated when the State "suppresses or fails to disclose material exculpatory evidence." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004) (describing the *Brady* rule). However, the *Brady* analysis is not well-suited to cases in which the evidence at issue has been lost or destroyed, and it is unknown whether the evidence would exculpate the accused:

"The due process concerns implicated in *Brady* makes the good or bad faith of the State irrelevant when the State fails to disclose material exculpatory evidence. However, due process concerns require a different result when the court is confronted with the failure of the State to preserve evidentiary material of which no more can be said than that it might

have exonerated the defendant. [Citation.] Therefore, where evidence has been lost or destroyed, 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' "

*In re C.J.*, 166 Ill. 2d 264, 272-73 (1995) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

Thus, a threshold question in a case like this is whether the State (a) failed to disclose exculpatory evidence—a *Brady* violation, in which the State's good or bad faith is irrelevant—or (b) simply failed to preserve potentially useful evidence "of which no more can be said than that it might have exonerated the defendant" (*id.*)—a possible due process violation requiring the defendant to show bad faith. *People v. Sandridge*, 2020 IL App (1st) 173158, ¶ 22. The Snapchat story at issue here falls in the second category.

¶ 30    The defendant argues strenuously that the Snapchat story would have been exculpatory evidence, but his argument that it would establish C.R.'s level of intoxication at various points in the evening shows only that it would have been highly relevant and useful evidence. His argument does not show that the evidence would have been *exculpatory*, *i.e.*, that it would have been favorable to the defense. As the defendant admits in his brief before this court, the Snapchat story could "either confirm[] or dispel[]" the witnesses' description of C.R.'s intoxication. Although it is possible that the Snapchat story would show that C.R. did not appear particularly impaired, it is equally possible that it would show her to have been extremely intoxicated, or even that it might fail to shed any light on her level intoxication at all. As the defendant has not shown that the unpreserved evidence was exculpatory, *Brady* does not apply. Further, given that the State produced discovery materials (a police report and the video recording of Strey's interview) that documented both the existence of the Snapchat story and part of the timeline of the evening, and

that the defense had equally good access to those materials as did the State, it is clear that the State fully complied with its obligations under *Brady*. See *Youngblood*, 488 U.S. at 55 (State complied with *Brady* by disclosing relevant materials mentioning the existence of the evidence and granting access to the materials that did exist).

¶ 31 Instead, the Snapchat story in this case falls into the category of potentially useful evidence "of which no more can be said than that it might have exonerated the defendant." *C.J.*, 166 Ill. 2d at 273. As such, the defendant must show that the police acted in bad faith in failing to preserve the Snapchat story. He has not met this burden. Although he argues persuasively that a reasonable police officer, when confronted with clearly relevant evidence, would take steps to preserve it, he has not identified any indicia of actual bad faith. The failure to take reasonable steps may be negligence, but negligence is not the same as bad faith. In *Youngblood*, the Supreme Court stated that the failure of the police to preserve the victim's clothing and test semen samples in a sexual assault case "can at worst be described as negligence," not bad faith, and thus the failure to preserve that evidence did not violate the defendant's due process rights so as to require reversal of his conviction. *Youngblood*, 488 U.S. at 58. By the same token, the failure to preserve the Snapchat story here may have been negligence but it did not rise to the level of bad faith.

¶ 32                              III. CONCLUSION

¶ 33 For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 34 Affirmed.