2020 IL App (1st) 173158

SIXTH DIVISION
JUNE 26, 2020

No. 1-17-3158

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 12772 |
| | ) | |
| JEFFREY SANDRIDGE, | ) | Honorable |
| | ) | Geary W. Kull, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Connors concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant-appellant Jeffrey Sandridge was convicted of first degree murder in the shooting death of Milton Carswell on May 3, 2014, for which he was sentenced to 60 years' imprisonment. On appeal, the defendant argues that his due process rights were violated when investigating police officers defied *bona fide* subpoenas and failed to preserve their field notes memorializing their interviews with eyewitnesses. For the reasons that follow, we reverse the judgment of the circuit court of Cook County and remand the case to the trial court with instructions.

¶ 2                                    BACKGROUND

¶ 3     In July 2014, the defendant was indicted on eight counts of first degree murder and one count of unlawful possession of a weapon by a felon arising out of the death of Milton Carswell in May 2014. The defendant sought discovery of, *inter alia*, "written or recorded memoranda containing the substance of oral statements by [ ] witnesses." The defendant also served a subpoena upon the Maywood Police Department in July 2014 requesting "any notes and memorand[a]

contained in any office, unit files, working files or running files, and all documents of any officer or detective for this case."

¶ 4    In February 2016, in its answer to discovery promulgated by the defendant, including the subpoenas for all notes, the State represented that *all* memoranda of oral statements given to police by witnesses were contained in the police reports that it had tendered to the defense in open court. One month later, the defendant filed a motion for the State to produce "a copy of any and all hand written notes in this case," but the State continued to deny having any handwritten notes in its possession.

¶ 5    A bench trial commenced on August 14, 2017, at which the evidence revealed that on May 3, 2014, the defendant shot Milton Carswell in the head and ran over his body in a parking lot of an apartment complex at 34 South 18th Avenue in Maywood, Illinois. Four witnesses testified at trial: Barbara Carswell, Milton Carswell's sister; Unique Reedy, Barbara Carswell's daughter and Milton Carswell's niece; Jose Fernandez, Milton Carswell's friend; and Tiffany Lewis, who was visiting family at the apartment complex on the day of the shooting.

¶ 6    Barbara Carswell testified that she lived at 29 South 18th Avenue in Maywood, across the street from the parking lot where the shooting occurred. The defendant was her ex-boyfriend. Three weeks prior to the shooting, she was in the parking lot on South 18th Avenue in Milton Carswell's car with Jose Fernandez and Milton Carswell when she had "an altercation" with the defendant, who wanted her to go into the house. The defendant hit her, and she "cut" him. Jose Fernandez and Milton Carswell intervened, and the defendant threatened to return and kill them. Following this incident, Barbara Carswell ended her four-year relationship with the defendant.

¶ 7    On May 3, 2014, at approximately 6:00 p.m., Milton Carswell was in the parking lot with Jose Fernandez and at least one other friend, known as J.B. According to Jose Fernandez, the three

had been drinking throughout the afternoon and were "pitching quarters" when Jose Fernandez saw the defendant drive into the parking lot in his Cadillac. Jose Fernandez had known the defendant for approximately six months from the neighborhood and from his relationship with Barbara Carswell. When the defendant arrived on May 3, 2014, Jose Fernandez quickly went inside his mother's apartment to avoid problems with him. From the window, Jose Fernandez saw the defendant exit his car holding a gun. The defendant walked to Milton Carswell and, holding a gun to Milton Carswell's head, walked Milton Carswell towards the street, where he shot him once in the head. The defendant then got back into his car and ran over Milton Carswell before exiting the parking lot.

¶ 8 Unique Reedy was also watching the altercation from her mother's house across the street. She knew the defendant from his four-year relationship with her mother, Barbara Carswell. Just as Jose Fernandez, she saw the defendant drive into the parking lot in his Cadillac. While she did not see the defendant's whole face, she saw his profile. The defendant and Milton Carswell walked toward each other, and the defendant then showed his gun and shot Milton Carswell in the head. She also saw the defendant run over Milton Carswell before leaving. Unique Reedy ran to her mom, who was in the house, and told her not to look outside because the defendant had shot Milton Carswell.

¶ 9 Barbara Carswell testified that when Unique Reedy told her of the shooting, she ran to the window and saw the defendant drive over Milton Carswell. The defendant made eye contact with Barbara Carswell before driving away. Barbara Carswell also testified that the defendant called her after he was arrested, while he was in jail. The trial court admitted the recorded calls into evidence. While this court was unable to play the CD recording of the calls that were made part of the record on appeal, the uncertified transcript of the calls that was provided to the trial court

revealed that the defendant offered Barbara Carswell money to change her identification testimony.

¶ 10 Tiffany Lewis saw the shooting from her car, which was parked in the parking lot. She and her two-year-old were waiting in the car while her two older children were in front of the building.[1] Tiffany Lewis saw the defendant drive into the parking lot in a gold Cadillac. She had seen the defendant with Barbara Carswell on prior occasions. The defendant walked across the parking lot to Milton Carswell with a gun in his hand. At trial, Tiffany Lewis testified that a white van then blocked her view of the defendant and Milton Carswell, and while she heard a gunshot, she did not see the defendant shoot Milton Carswell. However, she was impeached with her prior statement to the assistant state's attorney one month after the shooting that nothing obstructed her view and she saw the defendant shoot Milton Carswell.

¶ 11 Following the shooting, Barbara Carswell, Unique Reedy, Jose Fernandez, and Tiffany Lewis all went to the Maywood police station, where they waited together in a room before a detective interviewed each of them separately. Barbara Carswell claimed that they did not talk about the shooting amongst themselves as they waited.

¶ 12 Officer Patrick Reilly, an investigator for the Maywood Police Department for two years at the time of the shooting, was called to testify by the State. On May 3, 2014, Officer Reilly was on patrol when he was called to the apartment building at 34 South 18th Street. When he arrived, he saw a black man face down on the ground with blood around his head and a 9-millimeter shell casing nearby. There were several people around the decedent. Officer Reilly testified that he spoke to Jose Fernandez and Tiffany Lewis at the scene, but his report said he spoke to four

---

[1]Unique Reedy also saw Kyle with two children in the parking lot.

witnesses; the remaining two witnesses were not identified. Officer Reilly testified that he took notes at the scene that he incorporated into his report. He believed the notes were in his locker, but when he went to retrieve them, he could not find them.

¶ 13 Detective Luis Vargas, a detective for the Maywood Police Department for eight years, also testified for the State. Detective Vargas was assigned to the Milton Carswell homicide investigation. When he arrived at the scene, he first spoke to Officer Reilly and then canvassed the scene. He then went to the police station where the witnesses were waiting. He met with all four witnesses and interviewed them separately. He acknowledged that they waited together in the same room prior to being interviewed. Following his conversations with the witnesses, he began looking for the defendant. The defendant was eventually located and arrested on June 27, 2014.

¶ 14 Detective Vargas testified that he took notes on his conversations with the witnesses on May 3, 2014, and those notes were the basis for the report he prepared on December 4, 2014. However, he admitted to discarding his notes after writing the report. On cross-examination, the detective testified that he "most likely" would have received the subpoena sent by the defense *before* he prepared his report on December 4, 2014. Detective Vargas claimed that he did not know *why* he did not provide his notes in response to the subpoena. He said that he destroyed his notes in spite of the subpoena because that was his common practice. He further stated that he believed they were his personal notes and he did not have to provide them in response to a subpoena. Defense counsel then queried the detective as to whether the Maywood Police Department had a common practice of destroying investigatory notes after receiving a subpoena, but an objection to that question was made by the State and sustained by the court. Defense counsel did not pursue any further inquiry regarding the notes and why Detective Vargas believed he could ignore a subpoena to produce his notes.

¶ 15    On redirect examination by the State, Detective Vargas said that he had no independent recollection as to exactly when he received the subpoena and that it could have been after he had destroyed his notes.

¶ 16    After the State rested, the defendant moved for a directed verdict, which was denied. The defense rested without putting on any evidence, and the parties proceeded to closing arguments.

¶ 17    The court found the defendant guilty of first degree murder. In its ruling, the court noted that the witnesses' testimony had been impeached, stating "some of the impeachment is alleged to be impeachment by omission, because of a police officer whose testimony defied belief, actually, in terms of whether or not he spoke to Miss Barbara Carswell and what she may or may not have said to him." Nevertheless, the court found it significant that all four witnesses named the defendant as the shooter and also accorded great weight to the telephone calls in which the defendant "went out of his way to make sure he was convicted" by asking Barbara Carswell to lie. The court found the defendant not guilty of unlawful use of a weapon by a felon because the State had not offered evidence of the defendant's felony status.

¶ 18    The defendant's posttrial motion was denied, and following a December 2017 sentencing hearing, the defendant was sentenced to 60 years' imprisonment. The defendant timely appealed following the denial of his motion to reconsider sentence.

¶ 19                              ANALYSIS

¶ 20    We note that we have jurisdiction to review this matter, as the defendant filed a timely notice of appeal following sentencing. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 21    The sole issue on appeal is whether Detective Vargas's and Officer Reilly's failure to preserve their field notes after receiving a subpoena for those notes violated due process and

discovery protections. At the outset, we note that the defendant failed to raise this issue either at trial or in a posttrial motion. As such, he has forfeited this argument for review. See *People v. Johnson*, 238 Ill. 2d 478, 484 (2010) (failure to object to an error at trial and include error in posttrial motion forfeits appellate review of error). However, the plain error doctrine allows us to consider an unpreserved error in two circumstances: (1) where a clear and obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) where a clear and obvious error occurred and the error itself is so serious that it affected the integrity of the trial, regardless of the closeness of the evidence. *People v. Harvey*, 2018 IL 122325, ¶ 15. The first step in plain error review is always to determine whether an error occurred. *Id.*

¶ 22    The destruction or loss of evidence by the State violates due process only under certain circumstances. First, we must determine if the evidence was material and exculpatory or only "potentially useful." See *People v. Cunningham*, 2018 IL App (1st) 153367, ¶¶ 33, 43. If the evidence was only potentially useful, then the defendant must show that the loss or destruction was due to bad faith on the part of the State in order to establish a due process violation. *Id.* ¶ 43; see also *Illinois v. Fisher*, 540 U.S. 544 (2004); *Arizona v. Youngblood*, 488 U.S. 51 (1988). "Bad faith 'implies a furtive design, dishonesty or ill will.' " *People v. Nunn*, 2014 IL App (3d) 120614, ¶ 17 (quoting *People v. Danielly*, 274 Ill. App. 3d 358, 364 (1995)).

¶ 23    Here, the defendant recognizes that Detective Vargas' field notes were only potentially useful, given that their destruction prevents us from ascertaining their contents, but argues that Detective Vargas did indeed act in bad faith in destroying his notes.[2]

---

[2]The defendant does not argue that the loss of Officer Reilly's field notes was in bad faith but only that the loss was a discovery violation.

¶ 24 Detective Vargas admitted that he "most likely" received the defendant's subpoena requesting his field notes *before December 2014*, when he wrote his report. Despite this fact, he *deliberately* destroyed his notes upon writing his report after receiving a properly served subpoena. To be sure, in *Fisher*, 540 U.S. at 548, the United State Supreme Court rejected the proposition that the destruction of evidence in the face of a pending discovery request is *per se* bad faith. But the facts in *Fisher* are inapposite to Detective Vargas' behavior in his case. In *Fisher*, the defendant was arrested in September 1988 after the police observed him trying to hide a bag of a white powdery substance during a traffic stop. *Id.* at 545. Four tests by the police confirmed that the substance was cocaine. *Id.* After the defendant was charged with possession of cocaine in October 1988, he served a discovery request seeking all physical evidence in the State's possession. *Id.* The State responded that the evidence would be made available at a reasonable time and date on request. *Id.* The defendant was then released on bond pending trial but failed to appear at a July 1989 court date. *Id.* He remained a fugitive until November 1999, when the outstanding arrest warrant was finally executed. *Id.* The State reinstated the cocaine possession charge but informed the defendant that the substance had been destroyed as a matter of established procedure in September 1999, 10 years after he first requested it. *Id.* at 545-46.

¶ 25 *Fisher* stands in stark contrast to this case, where Detective Vargas *intentionally* destroyed his field notes at a time that was almost contemporaneous with the time period in which they were subpoenaed by the defendant. There is no indication that the destruction of the notes was part of the Maywood Police Department's procedure.[3] On the contrary, this destruction to all appearances

---

[3]The court inexplicably sustained objections as to whether Detective Vargas usually destroyed his field notes and whether it is common practice in the Maywood Police Department to destroy notes (especially after the issuance of a subpoena for those notes), denying defense counsel the opportunity to determine if proper protocol was followed.

seemed willful, inexplicable, and outside of normal procedures and violated Illinois law. The law explicitly requires that all field notes related to homicide investigations *must* be provided to the prosecuting authority. 725 ILCS 5/114-13(b) (West 2016). On cross-examination, Detective Vargas' answers as to why he destroyed his notes betrayed a cavalier and defensive attitude:

"Q. And when you received the subpoena, why didn't you provide your notes?

A. Don't know.

Q. What did you do with the notes? You said you destroyed them, correct?

A. Correct.

***

Q. Why did you destroy them?

***

A. Well, it is common practice. Usually, they are my personal notes, and that's what — basically I destroy them after I put the supplemental report together."

Despite claiming that his field notes taken during the initial witness interviews were his "personal notes," Detective Vargas also admitted that they were made in the course of his duties as a Maywood police detective and for the purpose of preparing his final report in a murder investigation. Thus, Detective Vargas' testimony at trial that he believed them to be his personal notes was disingenuous at best and blatantly untrue at worst. Under these circumstances, it is not far-fetched to draw a negative inference regarding the destruction of the notes. The action leaves many unanswered questions regarding the findings of Detective Vargas' initial witness interviews.

It defies belief and strains credulity to accept as true the testimony of an experienced police detective who denies knowing that his notes attendant to a murder investigation must be produced upon subpoena. Detective Vargas, without explanation, flagrantly violated Illinois law and openly disregarded a properly served subpoena. His actions were compounded by the trial court curtailing defense counsel's right to inquire into the Maywood Police Department's practice of destroying field notes in murder investigations.

¶ 26    Having determined that an error occurred that affected the defendant's due process rights, we next consider the "severity of the error and its threat to the fairness and integrity of the trial" to determine whether it satisfies the second prong of plain error. *People v. Getter*, 2015 IL App (1st) 121307, ¶ 57. Here, the *willful* destruction of Officer Vargas' notes forced the defendant to proceed to trial without knowledge of the results of the initial witness interviews. As such, the defendant could not cross-examine the alleged four eyewitnesses—on whose testimony his conviction rested—regarding discrepancies, if any, between their initial interviews and their written statements one month later. Under these circumstances, we hold that the due process violation due to the *intentional* destruction of Detective Vargas' notes was a severe error that affected the fairness of the defendant's trial and the integrity of the judicial system. It was egregious conduct that entirely disregarded the rule of law. To hold otherwise would be to signal that flouting established Illinois law during a criminal trial is without consequences so long as the State believes the evidence is overwhelming. This, we cannot do.

¶ 27    Because we hold that this was plain error, we find that it was not forfeited. This was a due process violation that was so egregious that it affected the integrity of the trial. Therefore, forfeiture does not apply. Indeed, errors such as these are the very reason that the plain error doctrine exists. And in any event, counsel attempted to question Detective Vargas in order to establish the due

process violation with more clarity but was prevented by the trial court from doing so, further precluding a finding of forfeiture.

¶ 28    Having found that the willful destruction of Detective Vargas' notes was plain error, such that the defendant satisfies the second prong of the plain error doctrine, we need not address the defendant's argument in the alternative that his counsel was ineffective for failing to move for sanctions based on the State's failure to comply with discovery rules. We note, however, that we question defense counsel's decision to simply move on to other questions after the objections to his questions regarding Maywood Police Department procedure were sustained by the trial court. While we are mindful that counsel may not have wished to incur the ire of the trial judge in a bench trial by pursuing a line of questioning which the court had ruled objectionable, at the same time, counsel should not have abandoned a clearly relevant line of questioning. Notwithstanding the trial court's decision to sustain the State's objection, defense counsel could have made a record regarding why he believed these questions were proper. The failure to do so is inexplicable.

¶ 29    Turning to the appropriate remedy for the due process violation, the defendant offers three suggestions: (1) dismissal of the charges against him; (2) remand for a new trial with directions to bar the testimony of Detective Vargas and the four witnesses he interviewed: Unique Reedy, Jose Fernandez, Tiffany Lewis, and Barbara Carswell; or (3) remand with directions for the trial court to conduct a hearing at which it may hear more complete testimony regarding the destruction of the notes and fashion an appropriate remedy for that due process violation.

¶ 30    Ordinarily, the trial court has discretion to impose an appropriate remedy for a due process violation. *People v. Stapinski*, 2015 IL 118278, ¶ 35. But here, because the defendant did not raise the due process violation before the trial court, that court did not have the opportunity to fashion an appropriate remedy in the first instance. Therefore, we believe the proper course is to remand

this case to the trial court to hold a hearing on the circumstances of the destruction of the relevant evidence, and based on the testimony elicited at that hearing, the trial court shall determine a suitable remedy and hold a new trial. This is particularly important given that defense counsel was barred from eliciting *any* testimony regarding the Maywood Police Department's practice as to the retention or destruction of field notes, which underpin murder investigations in general and the charges in this case in particular.

¶ 31      The reason for this cannot be discerned from the record. What is clear is that Detective Vargas *intentionally* destroyed his notes *after* they were subpoenaed. We cannot overlook this blatant disregard of the law on the ground that the evidence of the defendant's guilt was overwhelming. To do so disregards the rule of law and the constitutional protections afforded *all* defendants regardless of the State's view of the evidence.

¶ 32      Finally, we note that the defendant does not challenge the sufficiency of the evidence in support of his conviction. Our supreme court has issued conflicting opinions on whether a reviewing court must consider whether double jeopardy precludes a retrial if a defendant has not raised a challenge to the sufficiency of the evidence. Compare *People v. Lopez*, 229 Ill. 2d 322, 366-67 (2008) (holding that court was "required" to consider sufficiency of the evidence against defendant notwithstanding his failure to contest it where court was remanding for a new trial), with *People v. Patrick*, 233 Ill. 2d 62, 76 (2009) (holding that because the defendant had not argued insufficiency of the evidence, there was no double jeopardy impediment to a new trial). In any event, the evidence presented overwhelmingly supports the defendant's conviction for first degree murder.

¶ 33                                   CONCLUSION

¶ 34    The defendant's conviction for first degree murder is vacated, and the case is remanded for a new trial with directions as discussed herein.

¶ 35    Vacated and remanded with directions.

---

**No. 1-17-3158**

---

| | |
|---|---|
| **Cite as:** | *People v. Sandridge*, 2020 IL App (1st) 173158 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-12772; the Hon. Geary W. Kull, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Daniel H. Regenscheit, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, David H. Iskowich, and Jessica L. Wasserman, Assistant State's Attorneys, of counsel), for the People. |

---