2026 IL App (1st) 231613-U

No. 1-23-1613

Order filed March 11, 2026

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 14 CR 12772 |
| JEFFERY SANDRIDGE, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Geary W. Kull, |
| | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Martin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's judgment, which found defendant guilty of first degree murder, is vacated and the case is remanded with instructions for further proceedings.

¶ 2     In 2017, defendant Jeffery[1] Sandridge was convicted of one count of first degree murder

based on the 2014 shooting death of Milton Carswell. Based on testimony at his trial that the

---

[1]Throughout the record, defendant's name is spelled as both "Jeffery," and "Jeffrey." We have opted to use the spelling found in defendant's Notice of Appeal.

Maywood Police Department (Department) destroyed handwritten investigative notes prior to trial, we reversed his conviction and remanded with instructions to hold a hearing to determine appropriate sanctions and a new trial. Following the hearing, the trial court found that the Maywood officers in question did not act in bad faith. As sanctions, the trial court permitted cross-examination at trial into the details surrounding the destruction of the notes and provided an instruction to the jury that it could draw an adverse inference from the destruction of the notes. Defendant was found guilty of first degree murder a second time.

¶ 3    Defendant now appeals, arguing that the trial court erred by finding the Department did not act in bad faith and that he is entitled to outright reversal of his conviction or a new trial.

¶ 4    For the following reasons, we vacate defendant's conviction and remand for further proceedings consistent with this order.[2]

¶ 5                                    I. BACKGROUND

¶ 6                              A. Prior Trial and Appeal

¶ 7    In 2017, defendant was convicted of the first degree murder of Carswell following a bench trial. He appealed, and this court reversed his conviction on the basis that the willful destruction of investigative field notes constituted a due process violation. *People v. Sandridge*, 2020 IL App (1st) 173158, ¶¶ 25-26 (*Sandridge I*). We remanded defendant's case for a hearing to determine the circumstances surrounding the destruction of the field notes and a suitable remedy, followed by a new trial. *Id*. ¶ 30.

---

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 8    At defendant's original trial, Detective Louis Vargas testified that he interviewed the eyewitnesses to Carswell's shooting on May 3, 2014, and that he took notes based on those conversations. He used those notes as the basis for a report he prepared on December 4, 2014, and then he destroyed the notes. Defense counsel issued a subpoena to the Department in July 2014, seeking any notes and memoranda created by any officer or detective in the case. Vargas testified that he "most likely" would have received the subpoena before he prepared his report, and that he did not know why he did not provide his notes in response to the subpoena. He claimed he destroyed his notes in spite of the subpoena because that was his common practice, and he did not believe he had to provide them because they were his personal notes.

¶ 9    Patrick Reilly, who was a patrol officer at the time of the shooting but is now a detective, testified at defendant's first trial that he interviewed witnesses at the scene, took handwritten notes, and incorporated those notes into a report. When asked about the location of his notes, Reilly stated he was "sure they are probably in my locker somewhere." When the trial court ordered Reilly to return to the Department to collect his notes and return, he stated, "It is a possibility that the names would be in there. Those would be the only notes I would have had." The trial court instructed Reilly to retrieve whatever notes he had. When Reilly returned, he testified that he could not locate any notes and that he did not recall what happened to them.

¶ 10    Following defendant's conviction, we did not hesitate to express our consternation about Vargas's testimony. We stated, "It defies belief and strains credulity to accept as true the testimony of an experienced police officer who denies knowing that his notes attendant to a murder investigation must be produced upon subpoena." *Sandridge*, 2020 IL App (1st) 173158, ¶ 25. We

also wrote, "Detective Vargas's testimony at trial that he believed [the notes] to be his personal notes was disingenuous at best and blatantly untrue at worst." *Id.*

¶ 11    This court's conclusion underscored the reason for the necessity of a remand:

"What is clear is that Detective Vargas *intentionally* destroyed his notes *after* they were subpoenaed. We cannot overlook this blatant disregard of the law on the ground that the evidence of defendant's guilt was overwhelming. To do so disregards the rule of law and the constitutional protections afforded all defendants regardless of the State's view of the evidence." *Id.* ¶ 31.

¶ 12                              B. Sanctions Hearing

¶ 13    Upon remand, the trial court held a sanctions hearing. Valerie Panozzo testified that she was retired, but that she was previously an Assistant Public Defender for the Law Office of the Cook County Public Defender and that she was defendant's appointed counsel during his first trial. Panozzo testified that she filed a motion for discovery at defendant's arraignment on August 20, 2014, which requested "any memoranda reporting or summarizing oral statements" by witnesses. Panozzo also issued a subpoena to the Department requesting notes and office memoranda, working files, and all documents made by any officer or detective. The subpoena was served on September 20, 2014, and set as returnable on October 8, 2014.

¶ 14    Panozzo stated that she received nothing in response to that subpoena, and thus issued another requesting the same documents that was served on October 27, 2014. Panozzo did not receive any handwritten notes or witness statements in response to that subpoena. Eventually, Panozzo received a report from the Department dated December 4, 2014. After receiving the report, Panozzo still attempted to obtain the investigative notes through a motion to produce filed

on March 14, 2016. In response, an assistant State's Attorney represented that no handwritten notes existed. Panozzo issued a subpoena to Vargas to appear for defendant's trial, and that subpoena asked Vargas to bring with him his complete file for defendant. Prior to the start of defendant's trial on August 14, 2017, Panozzo did not know that any handwritten notes ever existed.

¶ 15    Steven Krueger testified that he previously worked for the Cook County State's Attorney's Office and that he prosecuted defendant during his first trial. Krueger testified that, in response to Panozzo's motion to produce, he contacted the Department's court officer and asked him to bring the full police file to court. Krueger and the officer went through the entire file with Panozzo. Krueger did not find it odd that the file contained no handwritten notes. He explained that it was "well known" that Maywood officers would take notes with witnesses, transcribe those notes into a report, and then destroy their notes. Krueger claimed this procedure went as far back as the 1990s. He admitted that he never told any Maywood officers not to destroy their notes, and he claimed he had never seen handwritten notes in cases involving Maywood officers.

¶ 16    Vargas testified that he was employed as a detective and that he had been working for the Department since 2004 when he started as a patrol officer. When Vargas became a detective in 2010, he received training from two detectives, but he could not recall if he received any training materials related to rules or procedures. When asked if he received any training related to the preservation of evidence, Vargas replied, "Basically, it was just — I was doing exactly what I was told by my training officer or detective at the time."

¶ 17    On May 3, 2014, Vargas responded to reports of a shooting. He initially claimed he could not recall if he interviewed any witnesses at the scene of the crime. After being shown the report he generated in this case, he recalled that it was only later that he interviewed four eyewitnesses at

the Department. At those interviews, Vargas took notes on his own notebook paper, and after the interview he kept the notebook on his desk.

¶ 18     When presented with a copy of the Department's policy manual, Vargas did not recall the section which stated, "Employees shall not convert to their own use, manufacture, conceal, falsify, destroy, remove or tamper with or withhold any property or evidence held in connection with an investigation or other official action except in accordance with established procedures." However, he testified that he was aware of the section of the manual which required him to "maintain written notes on police matters such as calls, arrests and other activities to the extent that they may later complete official reports and accurately testify in official proceedings."

¶ 19     Vargas testified that the day of the witness interviews in this case, he typed up his report and then destroyed his notes by shredding them either the same day or the following day. He explained that such a practice was taught to him by the detectives who trained him, and he had never been disciplined for doing so. Regarding the Department's subpoena procedures, Vargas testified that when a subpoena arrived for a case he had investigated, a person he described as the "front officer" would provide him a copy of the subpoena. However, he denied ever receiving a subpoena in defendant's case or being made aware of any subpoenas. He also asserted that his notes were destroyed by September or October of 2014, when defense counsel first issued subpoenas. Vargas suggested that, although his report was dated December 4, 2014, their computer system updates the date of the report whenever it is opened or edited.

¶ 20     Vargas could not recall if his notes were a verbatim recording of what witnesses told him in this case. He could not recall if he recorded the questions he asked witnesses. And he could not

recall whether his final report in this case was a word-for-word reproduction of his notes or if the report differed from his notes.

¶ 21    Regarding his previous trial testimony, Vargas claimed that he would not have destroyed his field notes if he had received a subpoena and that his testimony at defendant's first trial was a mistake. However, he admitted he did not actually know when he destroyed his notes.

¶ 22    Reilly testified that he began working at the Department in 2012 as a patrol officer. Reilly testified that he could not recall whether anyone instructed him on how he should preserve investigative documents. On May 3, 2014, Reilly responded to a location in Maywood where a shooting had occurred. At the scene, Reilly interviewed two witnesses and "jotted down a quick synopsis of what they told" him on a notepad the size of his hand. He stated that his conversations were short and intended only to determine who detectives should interview. Reilly used those notes to write a report, but he could not recall what he did with the notes afterward. According to him, "There's been times where I've had them in a locker. There's been times where I destroyed them." However, he stated, "Absolutely," when asked if it was common practice for officers and detectives to destroy their handwritten notes. He did not recall ever being trained on how to preserve investigative documents, but no one ever told him not to destroy his notes.

¶ 23    While Reilly could not remember what happened to his notes, he stated it was fair to say that his notes were not a verbatim account of what witnesses told him and that he did not write down what questions he asked to witnesses.

¶ 24    Sergeant Jeremy Pezdek testified that in 2014 he was employed by the Department as a shift supervisor for patrol officers. The Department had a policy manual which he testified was

made available to all officers and that all officers are required to be familiar with its contents. According to Pezdek, officers are expected to adhere to the rules in the manual.

¶ 25    Pezdek testified that a portion of the manual states, "Employees shall maintain written notes on police matters such as calls, arrests and other activities to the extent that they may later complete official reports and accurately testify in official proceedings." He also acknowledged that another section states, "Employees shall not convert to their own use, manufacture, conceal, falsify, destroy, remove or tamper with or withhold any property or evidence held in connection with an investigation or other official action except in accordance with established procedures."

¶ 26    Pezdek testified that he did not review a supplemental narrative report generated in defendant's case. He only reviewed the general responding report generated by Reilly. When confronted with Vargas's supplemental report, Pezdek confirmed that his name appeared at the bottom of the report as having approved it. He could not explain why the report appeared that way.

¶ 27    When Pezdek was asked, "Was there a policy in Maywood in 2014 that allowed for officers and detectives to destroy their handwritten notes if they transposed them to their final report?" he replied, "Yes. That was a common practice." Pezdek was asked if that was something he was trained to do, and he responded:

>    "It was just a — it was just something that was done daily with report writing. Guys would take notes and transfer their notes to a report and then, you know, when your notebook pad filled up, you'd replace it and buy a new one."

¶ 28    He further testified that if he became aware that officers were taking handwritten notes and then destroying them after writing a report, that would not have been a problem.

¶ 29    Regarding subpoenas at the Department, Pezdek explained that a subpoena for a murder case would go to the Records Department, and then staff for the Records Department would work with the detective assigned to the case to find the requested documents because detectives keep their files for major cases locked in cabinets.

¶ 30    Following the testimony, defendant asked the trial court to dismiss the charges against him on the basis that the Department and its officers acted in bad faith by destroying evidence. Alternatively, it asked the trial court to give the jury an adverse inference instruction.

¶ 31    The trial court stated that the testimony showed "simply the disorganized state, sloppy, disorganized, haphazard, whatever you want to call it, of at least the Maywood Police Department." It also endorsed defense counsel's description of the conduct as "egregiously negligent."

¶ 32    During its ruling, the trial court asked whether we should tolerate the Department's "sloppiness," and stated:

> "I certainly don't believe we should tolerate it. And that's why the law has been advanced and we continue to advance the law.
>
> We now have body cams when we didn't have body cams. We have squad videos when we didn't have squad videos. We have audiotapes in a lot more situations. 911 tapes are preserved a lot more regularly. And, of course, there is the videotaped statements of witnesses and children. And we're doing our best to preserve what is the truth in terms of prosecuting and defending criminal conduct."

¶ 33    The trial court then concluded that Vargas's "flaw" was that he "answered questions off the top of his head," and that it did not think "his inconsistencies show me that he was trying to

mislead anyone." It also stated that trial counsel could have investigated the eyewitnesses and spoken to them to determine whether the police reports were accurate.

¶ 34    The trial court found that none of the individuals in this case acted in bad faith. As a result, the trial court declined to impose a sanction of either dismissal or exclusion of any testimony. Accordingly, the trial court stated it would permit cross-examination at trial regarding the destruction of the notes and that it would provide the jury with an adverse inference instruction.

¶ 35                                    C. Retrial

¶ 36    As opposed to his first trial, defendant opted for a jury for his retrial.

¶ 37    Unique Reedy testified that on May 3, 2014, she was looking out the front door of her house. Her uncle, Carswell, was drinking beer across the street with Jose Fernandez. Defendant arrived in his gold Cadillac, parked, and exited the vehicle. Defendant previously dated Reedy's mother, Barbara Carswell.

¶ 38    Reedy saw defendant walk to Carswell, point a gun at his head, and shoot him. Reedy ran to her mother to tell her that defendant shot Carswell, and the two of them ran to a window. From there, Reedy watched defendant reenter his Cadillac, back over Carswell's body, and drive away.

¶ 39    Reedy went to the police station and sat in a conference room with three other witnesses, Fernandez, Tiffany Lewis, and her mother, Barbara. She testified that they did not speak to each, were interviewed one by one, and denied that anyone told her to identify defendant. The same individuals gathered at the police station again on May 28, 2014, and were again interviewed separately. Reedy testified that she told police that defendant was the perpetrator.

¶ 40    Barbara testified that she was Carswell's sister, and that she dated defendant for several years in the past. Approximately three weeks before the shooting in April 2014, she and defendant

had an altercation in a parking lot that resulted in Barbara slashing defendant with a boxcutter. Carswell intervened, and defendant threatened to kill him.

¶ 41    On May 3, 2014, Barbara returned home and saw Carswell drinking with friends in the parking lot. She also saw Tiffany Lewis, a group of kids, and a neighbor named Kyle in the parking lot. Barbara was changing when Reedy came in and told her that defendant had shot Carswell. She looked out the window and saw defendant back his car over Carswell's head. Barbara then ran outside and saw defendant drive away. As he drove away, defendant made eye contact with Barbara.

¶ 42    Following the shooting, Barbara spoke with police at the scene and identified defendant as the shooter. She did not know if any officers took notes. Like Reedy, Barbara testified that she went to the police station and waited in a conference room with the other witnesses. She claimed she spoke to the police three times, once at the scene, at the station shortly after, and a final time a month later. She could not recall if she told police that she and defendant made eye contact as she drove away.

¶ 43    Barbara further testified that defendant called her from jail multiple times in March of 2016. Barbara believed the substance of those calls was that defendant was offering Barbara money to lie for him. But defendant told her on the phone that was not what he was offering and claimed she knew the case against him was "bullshit."

¶ 44    Fernandez passed away before defendant's retrial, so his testimony from defendant's first trial was admitted and published to the jury. Fernandez testified that three weeks before Carswell's death, defendant threatened to kill Carswell and Fernandez after they broke up a fight between defendant and Barbara. On May 3, 2014, defendant drove his gold Cadillac into the parking lot

where Fernandez and Carswell were drinking with two other individuals named JB and Kyle. Fernandez went inside his apartment, and from his window he saw defendant walk up to Carswell with a silver gun. He claimed that defendant made eye contact with him and mouthed "f*** you," before killing Carswell. Defendant returned to his car, backed over Carswell's body, and drove away. Fernandez spoke with police at the scene and at the police station. He identified defendant as the shooter in a photo array.

¶ 45    Reilly testified that he responded to the scene and spoke to multiple witnesses to gather information for investigators. He made notes from his conversations with Lewis and Fernandez and others, whose names he claimed would have been in his notes. After typing up a report, he destroyed his notes. His report listed Fernandez and Lewis as witnesses, but also referenced two other unnamed witnesses. It did not mention Reedy or Barbara. Reilly also could not recall if he spoke to JB, Kyle, or Reedy. Reilly further testified that he was unaware of any statute that required him to produce his handwritten field notes to prosecutors.

¶ 46    Vargas testified that he interviewed Barbara, Reedy, Lewis, and Fernandez at the police station immediately following the shooting. He claimed each witness was interviewed separately and they did not speak to each other in the conference room. He kept notes of those interviews, but destroyed them. After defendant's arrest, he interviewed the witnesses again on May 27, 2014. He took additional notes, but those were also destroyed after he created his report.

¶ 47    Vargas claimed that his written notes were transferred verbatim to his report, but he also admitted that the notes of his interviews were a summary of witnesses' statements and not written verbatim. Like Reilly, Vargas was unaware of any statute that required the production of his handwritten notes to prosecutors. He claimed his prior testimony that he retained his notes until

December 4, 2014, was mistaken, and that he destroyed his notes the same day of his interviews. He also claimed his prior testimony was mistaken when he assumed he had received any subpoenas in this case.

¶ 48     The trial court read the jury an instruction that stated, "If a party to this case has failed to maintain evidence within his power to produce, then you may infer that the evidence would be adverse to that party."

¶ 49     The jury found defendant guilty, and the trial court ultimately sentenced defendant to 58 years in prison. This appeal followed.

¶ 50                                  II. ANALYSIS

¶ 51     On appeal, defendant argues that the trial court's factual finding that Vargas and Reilly did not act in bad faith was against the manifest weight of the evidence and that the conduct at issue in this case warrants a more severe sanction than those ordered by the trial court. However, at the outset, the State's response brief claims that the trial court lacked the jurisdiction to decide whether Vargas acted in bad faith while maintaining that the trial court's sanctions were appropriate. Thus, we must address this jurisdictional question.

¶ 52     It is well recognized that a reviewing court's mandate vests a trial court with jurisdiction only to take action that complies with the reviewing court's mandate. *McDonald v. Lipov*, 2014 IL App (2d) 130401, ¶ 44. A trial court lacks the authority to exceed the scope of the mandate and must obey precise and unambiguous directions on remand. *Id*. Any other order issued by the trial court is outside the scope of its authority and void for lack of jurisdiction. *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276-77 (1982). Directions that are precise and unambiguous must be obeyed. *Id*. at 276. Even when this court's directions are erroneous, the trial court is nevertheless

required to strictly follow those directions. *Id*. at 277. When no such directions are given, the trial court must determine from the nature of the case what further proceedings are appropriate. *People v. Abraham*, 324 Ill. App. 3d, 26, 30 (2001).

¶ 53    A mandate that reverses is final upon all questions decided. *People v. Luna*, 2025 IL App (2d) 240382, ¶ 27. But only a decision on the merits of a question deprives the lower court of the ability to take further action on that question. *Id*. Thus, a trial court may take actions that are not specified, but still in conformance with, the mandate. *Id*. ¶ 28. The correctness of the trial court's action on remand is to be determined from the appellate court's mandate. *Abraham*, 324 Ill. App. 3d at 30. However, when the mandate directs the trial court to proceed in conformity with the opinion issued, the opinion must be consulted to determine the appropriate course of action. *Id*.

¶ 54    Although neither party questioned the trial court's jurisdiction below, subject-matter jurisdiction cannot be waived and cannot be conferred by consent of the parties. *People v. Brown*, 2020 IL 124100, ¶ 17. A void order does not cloak the appellate court with jurisdiction to consider the merits of an appeal. *People v. Flowers*, 208 Ill. 2d 291, 307 (2003). Where the trial court had no jurisdiction to consider an issue, a court of review likewise has no authority to consider the merits of an appeal from the trial court's judgment on that issue. *Id*. A reviewing court has a duty to ascertain its jurisdiction before proceeding in an action on appeal. *In re Estate of Mivelaz*, 2021 IL App (1st) 200494, ¶ 60.

¶ 55    The State asserts that the trial court lacked jurisdiction to assess whether Vargas's actions violated defendant's due process rights and that our mandate vested it only with the authority to discover the circumstances of the evidentiary destruction and fashion an appropriate remedy. In response, defendant argues that in *Sandridge I* we recognized that the trial court had precluded the

- 14 -

parties from exploring at length the circumstances surrounding Vargas's act of destroying his notes. Thus, he asserts that a hearing on those circumstances necessarily encompassed a determination on whether Vargas and others acted in bad faith. Accordingly, we must address what *Sandridge I* ordered and what trial court actions were within the scope of our mandate.

¶ 56 The mandate of this court in *Sandridge I* contained little information and stated that the cause was "vacated and remanded with directions." Thus, we must consult the opinion to determine the proper scope of the trial court's actions on remand. In *Sandridge I*, defendant argued that Vargas's act of destroying his field notes violated due process and discovery protections, and that Reilly's actions constituted a discovery violation. We did not mince words when discussing Vargas's conduct:

"Under these circumstances, we hold that the due process violation due to the intentional destruction of Detective Vargas's notes was a severe error that affected the fairness of the defendant's trial and the integrity of the judicial system. It was egregious conduct that entirely disregarded the rule of law. To hold otherwise would be to signal that flouting established Illinois law during a criminal trial is without consequences so long as the State believes the evidence is overwhelming." *Sandridge I*, 2020 IL App (1st) 173158, ¶ 26.

¶ 57 We also stated, "It defies belief and strains credulity to accept as true the testimony of an experienced police officer who denies knowing that his notes attendant to a murder investigation must be produced under subpoena." *Id*. ¶ 25. We also opined that Vargas "flagrantly violated Illinois law and openly disregarded a properly served subpoena." *Id*. After finding that the error constituted second-prong plain error, we emphasized the gravity of the error by observing that "errors such as these are the very reason that the plain error doctrine exists." *Id*. ¶ 27. As we said

then, "We cannot overlook this blatant disregard of the law on the ground that the evidence of the defendant's guilt was overwhelming. To do so disregards the rule of law and the constitutional protections afforded all defendants regardless of the State's view of the evidence." *Id*. ¶ 31.

¶ 58    Although we never explicitly stated that Vargas acted in bad faith, our conclusion that the destruction of his notes was a due process violation was made in the context of *Arizona v. Youngblood*, 488 U.S. 51 (1988). *Id*. ¶ 22. Furthermore, we analyzed another case, *Illinois v. Fisher*, 540 U.S. 544 (2004), involving a claim of bad faith and compared it to defendant's circumstances before concluding that Vargas's actions violated defendant's due process rights. *Id*. ¶¶ 24-25.

¶ 59    Moreover, in *Youngblood*, the United States Supreme Court drew a distinction between due process protecting against the suppression of exculpatory evidence, regardless of good or bad faith, and the destruction of potentially exculpatory material. *Youngblood*, 488 U.S. at 57-58. There, it reasoned that the destruction of potentially exculpatory material in the absence of bad faith does not constitute a denial of due process. *Id*. at 58. *Sandridge I* plainly concluded that Vargas's field notes were only "potentially useful." *Sandridge*, 2020 IL App (1st) 173158, ¶ 23. Accordingly, the destruction of Vargas's notes could not have violated defendant's due process rights outside of a bad faith analysis. We unquestionably decided the issue of whether the destruction of evidence violated defendant's due process rights on the merits—it was the sole basis upon which we vacated defendant's conviction. This leads us to the remedy ordered.

¶ 60    We concluded, "[B]ecause the defendant did not raise the due process violation before the trial court, that court did not have the opportunity to fashion an appropriate remedy in the first instance. Therefore, we believe the proper course is to remand this case to the trial court to hold a

hearing on the circumstances of the destruction of the relevant evidence, and based on the testimony elicited at that hearing, the trial court shall determine a suitable remedy and hold a new trial." *Id*. ¶ 30.

¶ 61    There was no ambiguity in our opinion about whether Vargas's actions violated defendant's due process rights. As we have summarized above, our consternation about this case and our condemnation of Vargas's actions was explicit. At no point did our opinion in *Sandridge I* suggest that we lacked enough information to determine whether a due process violation had occurred, or that a hearing was necessary to determine whether defendant's rights were violated. We did not instruct the trial court to revisit whether defendant's due process rights were violated or if Vargas acted in bad faith. There was only one issue we instructed the trial court to decide: what a suitable remedy would be for defendant's deprivation of due process.

¶ 62    It is clear from the outset of the evidentiary hearing in this case that the trial court misapprehended the task put to it, as it said the purpose of the hearing was to determine "whether or not sanctions are appropriate and, if so, what they might be." Similarly, during argument, the trial court stated, "That's [bad faith] really the whole issue. Because there's no question that these — that these notes should not have been destroyed based on the law. The question is what would the remedy be? And the question becomes whether or not it is bad faith." But our opinion never instructed the trial court to hold a hearing to determine *if* sanctions were appropriate, nor did we instruct the trial court to re-analyze whether defendant's due process rights were violated.

¶ 63    The trial court did not act within the scope of our mandate. *McDonald*, 2014 IL App (2d) 130401, ¶ 44. We rendered a final decision on the merits of defendant's claim that Vargas's destruction of evidence constituted a due process violation. Revisiting that issue and making a new

ruling that contradicted the substance of our opinion exceeded the authority our mandate vested in the trial court. *Id*. Accordingly, the portion of the trial court's ruling that concluded Vargas did not act in bad faith is void for lack of jurisdiction and we cannot consider its merits on this appeal. *Schreier*, 92 Ill. 2d at 276-77; *Flowers*, 208 Ill. 2d at 307. That leads us to defendant's argument on appeal that a more severe sanction was warranted.

¶ 64    The trial court undoubtedly had jurisdiction to fashion a remedy, an action that fell squarely within our instructions in *Sandridge I*. And that portion of the trial court's judgment is properly before us. However, our previous opinion ordered the trial court to fashion an appropriate remedy because it had not yet had an opportunity to do so. We have little confidence that the severity of the trial court's remedy was not predicated on or influenced by its conclusion that Vargas did not act in bad faith and that the Department was simply sloppy and disorganized. Thus, the trial court has not yet crafted a remedy for defendant's deprivation of due process that is consistent with our prior opinion.

¶ 65    Accordingly, the most sensible remedy is to vacate the trial court's judgment and remand this case so that the trial court can: (1) craft an appropriate remedy for defendant's deprivation of due process and, assuming the remedy does not foreclose it, (2) hold a new trial. Undoubtedly, the contents of the hearing that occurred below can and may influence the severity of the sanction imposed. But critically, the remedy must be one that is consistent with our original opinion that the intentional and flagrantly illegal destruction of evidence in this case violated defendant's right to due process, not one that abandons that conclusion.

¶ 66                                    III. CONCLUSION

¶ 67    Defendant's conviction for first degree murder is vacated, and the case is remanded for further proceedings consistent with the above directions.

¶ 68    Vacated and remanded with directions.